UNITED STATES of America

v.

Bruno MANCARI, et al.

Nos. 86CR707 to 86CR710.

United States District Court,
N.D. Illinois, E.D.

· May 8, 1987.

Victoria Peters, Asst. U.S. Atty., Chicago, Ill., for the U.S.

Jeffrey Steinback, Genson, Steinback & Gillespie, Chicago, Ill., for defendant Bruno Mancari.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

### Introduction

Local Rule 2.31 provides for reassignment of pending cases involving common issues of fact or law to one judge where that reassignment promotes judicial efficiency and is requested by any party. N.D. Ill. Rule 2.31(A) and (B). Bruno Mancari, the lead defendant in the above captioned cases, petitioned this court for such consolidation in an unopposed motion last November.[1] See def. motion to reassign in No. 86 CR 707 (Getzendanner, J.) at ¶ 3.[2] At that

---

1. Local rule 2.31(C) provides that "the motion shall be filed with the judge before whom the lowest-numbered case of the claimed related set is pending."

2. Because each of the related cases is captioned "United States v. Bruno Mancari," I refer to the different indictments discussed in this opinion by the case number, with the presiding judge's name listed in parenthesis, e.g., No. 86 CR 707

time, I indicated to the parties that, with the agreement of the other judges involved, I would rule on Mancari's "motion to dismiss or in the alternative suppress evidence." ("motion to dismiss"). See minute order of December 1, 1986, No. 86 CR 707 (Getzendanner, J.).[3] Pursuant to local rule 2.30(e), these cases will be returned to those judges following the completion of my ruling on Mancari's motion to dismiss.[4]

That motion raises challenges under the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968 to the Federal Bureau of Investigation's ("FBI") wiretap on Mancari's telephone. That surveillance was undertaken pursuant to a January, 1983, order of former Chief Judge Frank J. McGarr[5] based upon an application submitted by FBI special agent Wayne F. Zydron ("Zydron"). The application alleged, in essence, that Mancari and others were involved in a widespread scheme to sell rebuilt automobiles composed of stolen bodies and other parts. It concluded that these persons were participating in an "enterprise involving a pattern of racketeering activity,"[6]

interstate transportation and receipt of stolen propery, and conspiracy to commit these offenses. The order approved use of the bugging until the FBI uncovered the extent and *modus operandi* of the conspiracy or until the statutory time limit on surveillance, thirty days, passed.[7] The order also provided that status reports of the surveillance be filed with the court every five days. See Order of January 20, 1983 at ¶ (b).

On February 24, 1983, Zydron filed an application with Chief Judge McGarr for an extension of the court's original order. The extension application, which incorporated its predecessor, modified somewhat the FBI's list of suspects and asserted that Mancari and his associates were involved in the distribution of controlled substances. Chief Judge McGarr approved the application for extension, subject to the same time and reporting limitations.[8]

More than three years later, on October 1, 1986, a special grand jury issued indictments in the four cases that are the basis

---

(Getzendanner, J.). All references to the parties' legal memoranda refer to the briefs addressing Mancari's "motion to dismiss or in the alternative suppress evidence."

**3.** Mancari has submitted numerous other motions in these cases, many of which touch upon the wiretap issues discussed herein. It is my understanding from the parties that I am only to decide the motion to dismiss.

Less clear is which of the other defendants have joined Mancari's motion. Mancari's counsel informed the court that Palaggi, Fallon, McCarthy, and Delpercio have adopted the motion while the government suggested that Mancari stands alone. To clear up this matter, the court orders each defendant wishing to adopt Mancari's motion to dismiss to file a motion to join containing a statement regarding standing. Those parties should come to the May 14, 1987, status conference prepared to discuss the standing issue.

**4.** Local rule 2.31 does not contemplate situations in which cases are temporarily reassigned for the sole purpose of deciding common questions of law. Since it is my understanding both from counsel and the other judges involved that the cases will be returned by agreement to their original judges upon my ruling on the motion to dismiss, I need not rule on Mancari's relatedness motion. See N.D.Ill.Rule 2.30(e) ("Reassignment by Agreement").

**5.** Judge McGarr has since become a senior district judge.

**6.** Such activity would violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq., which is commonly known as "RICO."

**7.** A copy of Zydron's application is included as exhibit 5 in defendant Mancari's appendix A, which is submitted as a part of his motion. I shall refer to it throughout this opinion as the "application" and cite to it as "app." Chief Judge McGarr's order approving this application may be found in Mancari's appendix B at exhibit 7. I shall refer to it as "Order of January 20, 1983."

**8.** A copy of Zydron's extension application is contained in Mancari's appendix B at exhibit 8; I cite it herein as "ext. app." Chief Judge McGarr's order approving the extension is reproduced in the same appendix as exhibit 10. Since it is undated, I will refer to it simply as the "extension order" and cite it as "ext. order."

The weekly reports issued pursuant to both the order of January 20, 1983, and the extension order are enclosed as group exhibit C in the government's appendix to its response memorandum.

of the issues before the court presently.[9] Three of those indictments charge Mancari and others with various acts of mail and wire fraud arising out of auto theft and insurance fraud related activities. See Nos. 86 CR 707 (Getzendanner, J.), 86 CR 709 (Kocoras, J.), 86 CR 710 (Nordberg, J.). The fourth indictment, No. 86 CR 708 (Leinenweber, J.), charges Mancari and an associate with distribution of cocaine.

With this background concluded, I turn to the issues presented by the defendant.

*I. Availability of Less Intrusive Investigative Techniques.*

■ At the outset, Mancari contends that the wiretap approved by Chief Judge McGarr was constitutionally and statutorily deficient because it was not justified by "genuine investigative necessity." Def. motion at ¶¶ 6, 7. According to Mancari, the application failed to explain adequately why traditional, less intrusive, police techniques were insufficient to crack the criminal enterprise under investigation. This failure, he claims, is legally fatal to the order. I disagree.

The constitutional argument, based on the warrant clause of the Fourth Amendment, is easily dismissed.[10] The Supreme Court has interpreted that provision to require only three things:

> First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense. Finally, warrants must particularly describe the things to be seized as well as the place to be searched.

*Dalia v. United States,* 441 U.S. 238, 255, 99 S.Ct. 1682, 1692, 60 L.Ed.2d 177 (1979) (internal citations omitted). The Court has

held that these "traditional Fourth Amendment requirements" govern the constitutionality of wiretapping. *Id.* at 255–58, 99 S.Ct. at 1692–94; *Berger v. New York,* 388 U.S. 41, 55–59, 87 S.Ct. 1873, 1881–84, 18 L.Ed.2d 1040 (1967).

■ Given this standard, the defendant's argument that "wiretapping passes constitutional muster only where ... the government has demonstrated that less intrusive investigative techniques have been unavailing" is, as a matter of law, simply wrong. See def. mem. at 4. The Fourth Amendment, at least where warrants are concerned, does not incorporate a "least intrusive alternative" requirement. Nor do the cases cited by Mancari suggest the contrary; those opinions deal with the legality of police action in the absence of a court order or involve challenges to wiretaps under the standards set forth by Congress in Title III. The constitutional claim based on necessity is therefore rejected.

The statutory argument based on Title III has more force. That law was drafted to balance congressional concern for citizens' privacy with the lawmakers' desire to employ more effective weapons in the fight against organized crime. *See United States v. Kahn,* 415 U.S. 143, 151, 94 S.Ct. 977, 982, 39 L.Ed.2d 225 (1974). Accordingly, Title III mandated that the use of electronic surveillance comply with certain requirements under pain of criminal and civil penalties. 18 U.S.C. §§ 2511, 2520. Congress also provided that conversations intercepted in violation of the statutory scheme are inadmissible before any judicial, legislative, or administrative hearings. 18 U.S.C. § 2515.

Under Title III, a federal law enforcement officer seeking use of electronic surveillance must submit an authorized application, under oath, to an Article III judge for prior approval.[11] The application must

---

9. The four indictments are reproduced in Mancari's appendix A as exhibits 1–4.

10. The Fourth Amendment states:
   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but

upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

11. For investigations undertaken by federal law enforcement personnel, an "authorized" application is one approved by the Attorney General or

state, inter alia, the facts and circumstances concerning the particular offense involved, the identity (if known) of those whose communications are to be intercepted, and the nature of those communications and the site from which they are to be monitored. 18 U.S.C. § 2518(1)(b). In addition, the affiant must make "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). An order authorizing surveillance, in turn, must explicitly conclude, inter alia, that "normal investigative procedures" are insufficient under the circumstances presented by the application. 18 U.S.C. § 2518(3)(c).

■ The purpose of these detailed requirements, as Justice White observed in *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), was to ensure that surreptitious interception of communications is undertaken with restraint and not "routinely employed as the initial step in criminal investigation." *Id.* at 515, 94 S.Ct. at 1827. *See also Kahn*, 415 U.S. at 153, n. 12, 94 S.Ct. at 983, n. 12. This does not suggest that wiretapping may only be used as a last resort upon the failure of all other methods of investigation. *United States v. Dorfman*, 542 F.Supp. 345 (N.D.Ill.1982), *aff'd, United States v. Williams*, 737 F.2d 594 (7th Cir. 1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). Rather, the provision envisions a "practical and common sense" assessment of the need for electronic surveillance. *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir.1976), quoting S.Rep. No. 1097, 90th Cong., 2d Sess. 101, reprinted in 1968 U.S. Code Cong. & Ad. News 2112, 2190. (Hereafter cited as S.Rep. No. 1097, 1968 U.S. Code at

2190.) The government's burden of establishing its compliance with subsection 2518(1)(c), the Court of Appeals has explicitly stated, "is not great." *Id.* at 431 (internal citations omitted).

■ This burden is met, the *Anderson* court observed, where the application demonstrates a factual predicate for its conclusion that normal investigative procedures have failed or are likely to do so. *In re DeMonte*, 674 F.2d 1169, 1174 (7th Cir. 1982), citing *United States v. Anderson*, 542 F.2d 428 (7th Cir.1976). As my colleague Judge Marshall has stated, "what counts is whether the agent's assertions are supported by the facts in the affidavit and the nature of the investigation being conducted." *Dorfman*, 542 F.Supp. at 399.[12]

■ I believe that the application at issue here meets that standard. In that application, FBI agent Zydron made the following claims concerning necessity:

1. That Mancari and his associates were very "surveillance conscious," thus casting doubt on the likely success of extended physical surveillance.

2. That due to the sporadic and short-lived nature of the physically observable part of the scheme, physical surveillance could not uncover or develop evidence of the full extent of the criminal enterprise, either with respect to its participants or its criminality.

3. That placement of an undercover agent was unfeasible because of the unavailability of an informant who would risk "almost certain exposure and resulting physical harm" to introduce the agent to the Mancari group. Zydron also questioned the ability of such an agent to become privy to the entire Mancari scheme—at least initially.

a specially designated Assistant Attorney General. 18 U.S.C. § 2516(1). The Supreme Court has held that this requirement must be scrupulously followed. *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Title III provides slightly different rules for state officials seeking authorization of electronic surveillance. 18 U.S.C. § 2516(2).

**12.** Both parties cite numerous decisions from other circuits interpreting the requirements of § 2518, parts 1(c) and 3(c). These cases indicate that the formulation of the proper standard varies, albeit slightly, from circuit to circuit. Since the issue has been decided (and reaffirmed) by the Seventh Circuit, I find no need to discuss those foreign cases here.

4. That of the four confidential informants aiding the government, three demanded and were promised assurances that they would not be called to testify. The three also have stated they would not testify, even with immunity, because of their fear that they and their families would be placed in danger by such action.

5. That the use of these informants would blow their cover in other investigations and adversely affect the willingness of others to aid the government by demonstrating the latter's willingness to breach confidentiality agreements.

6. That granting immunity to one or more of the suspected conspirators in return for information and a promise to testify would be unsuccessful because the conspirators would reject the offer out of fear for their safety.

7. That calling any of the conspirators to testify before the grand jury could reveal the objective of the investigation to the criminal enterprise, allowing it to more effectively cover its tracks.

Despite Mancari's claims to the contrary, the facts alleged in the affidavit support Zydron's assertions concerning the limited utility of physical surveillance. The defendant correctly observes that the application's hearsay allegation regarding Mancari's surveillance consciousness is somewhat conclusory. Nevertheless, I believe that the hearsay is entitled to some weight. The declarant, Detective John F. Miller, is identified in the application as a member of the Chicago Police Department's special investigations unit with over fifteen years of experience in auto theft. As such, he participated in the surveillance of Mancari and appears to be well acquainted with the *modus operandi* of Mancari and his associates.

Also supportive of Miller's statement is the limited success physical surveillance yielded. For example, such observation by state law enforcement officers at a Phillips 66 service station at 6800 West 63rd Street, Chicago, Illinois, revealed Mancari and defendant James Palaggi, Jr., in custody of a 1981 Oldsmobile bearing license plates registered to another car. App. at 9–10. The Oldsmobile was later sold by defendant Frank Conte at an auction at which Mancari and Palaggi were present. App. at 11.

Subsequent investigation revealed that the car was a "salvaged vehicle"[13] sold by Midwest Auto Salvage of Wisconsin ("Midwest Auto") to a "fictitious name known to be used by Bruno Mancari" and that Conte had falsely represented himself as an agent of an established dealer in making the auction sale. App. at 11. Police also learned that a similar 1981 Oldsmobile had been stolen in Glenview, Illinois, two weeks prior to the auction. Based upon their considerable experience in investigating auto theft and an investigation of the auctioned vehicle, state police concluded that the body of the stolen car was switched onto the frame of the salvaged vehicle Mancari acquired from Midwest Auto. The stolen body was then retagged with the vehicle identification number ("VIN") plate from the salvaged auto's body.

This investigation, while implicating Mancari, Palaggi, and Conte in a scheme involving one body switch, could not resolve other, necessarily lingering, questions regarding the extent of the criminal activity—even with respect to this one automobile. These questions included who stole the 1981 Oldsmobile on behalf of the enterprise, who conducted the mechanical operations of switching and retagging, who drafted the false salvage certificates and affidavits sent to the Illinois Secretary of State's office, and whether agents of Midwest Auto or the automobile auction were involved. Although some of this information, initially learned from confidential in-

---

**13.** The indictment in case No. 86 CR 707 (Getzendanner, J.) defines a "salvage vehicle" as a titled vehicle which has been "damaged to the extent that the cost of repair exceeds the value of the vehicle." ¶ 1(c). See also Zydron app. at 5; Ill.Rev.Stat. ch. 95½, ¶ 3–117.1 (listing situations in which a vehicle *must* be considered salvage). State law requires that such vehicles be evidenced by a "Salvage Certificate of Title" and limits sale of salvage pieces to state licensed automobile rebuilders. *Id.* at ¶¶ 3–117.1, 3–118, 5–301. The law also requires that the title of rebuilt vehicles contain a notation to that effect. *Id.* See app. at 5.

formants, might later be corroborated by physical surveillance and other traditional police techniques, it is clear from the nature of this scheme that physical observation could not penetrate to the core of criminality suggested by those observations, much less provide much evidence of the entire enterprise. *See United States v. Johnson,* 645 F.2d 865, 867 (10th Cir.), *cert. denied, Ableidinger v. United States,* 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981) (electronic surveillance justified where needed to identify all the conspirators and to determine precise nature and scope of the illegal activity).

Mancari also challenges as conclusory the application's assertion that an undercover agent could not infiltrate the scheme without jeopardizing the safety of the informant who introduced the agent to the enterprise. To this end, the defendant notes, the application's statement is contradicted by its assertion that Confidential Informant # 4 carried a concealed recording device in his meetings with members of the Mancari group and has agreed to testify. While correct, the point is not determinative (despite the government's failure to respond). It is apparent from the information provided by the other informants, all of whom have refused to testify, that Informant # 4 was aware of only a small part of this conspiracy. This fact buttresses agent Zydron's doubts about the ability of an agent to penetrate to the heart of the scheme.

Similarly unpersuasive is the defendant's observation, however accurate, that Zydron's assertions of dangerousness and unfeasibility are conclusory. To some extent, a court has no choice but to accept such conclusions. The decision whether to employ an undercover agent is a judgment which must be based on a current assessment of the circumstances and an expertise in law enforcement gleaned from practical experience. This court does not have the latter and, realistically, is probably unable to completely comprehend the former. Given that, decisions which involve the personal security of those assisting the government must be accorded great deference.

This is true even in situations, such as that posed here, where no particularized facts are set forth suggesting that such danger in fact exists. In this case, the unwillingness of the confidential informants to come forward because of fear for their safety indicates that the agents investigating Mancari had cause for concern. Considering the delicacy of the decision involved, I believe *Anderson* requires no more.[14]

I find Mancari's claim that wiretaps were not necessary because the government could rely on these informants for evidence at trial unpersuasive for the same reasons. Of those four informants, three refused to testify out of fear and asserted that immunity would not change that result. Although Mancari's observation that he has no means of verifying this information is true, the application gives no reason to doubt those statements. On the contrary, the evidence uncovered by law enforcement personnel based on information provided by those informants suggests that they were generally reliable. These facts lead me to conclude that the application sufficiently explained why stronger reliance on confidential informants was not feasible.

---

**14.** Mancari asserts that the "speculative nature of the affiant's claim here is revealed by the cooperation of Defendants Hurd, Hill, Peco, Lukis, and other individuals." Def. mem. at 24. This argument obscures the proper inquiry facing the court. By raising facts which Chief Judge McGarr could not have considered, the argument beckons me to use hindsight in appraising the application's statement of necessity. That I will not do. See *Spinelli v. United States,* 393 U.S. 410, 413 n. 3, 89 S.Ct. 584, 587 n. 3, 21 L.Ed.2d 637 (1969), quoting *Aguilar v. Texas,* 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 1511 n. 1, 12 L.Ed.2d 723 (1964) ("It is elementary that in passing on the validity of a warrant, the reviewing court may consider *only* information brought to the magistrate's attention.") (emphasis original).

In any event, the argument is not persuasive on the merits. See *Van Horn,* 789 F.2d at 1497 ("that witnesses were willing to testify in court after the FBI had broken the conspiracy and arrested its members does not indicate that they would have been willing to do so at the time the surveillance was requested.")

Mancari asserts that I should not reach this conclusion for several reasons. First, he argues, the Supreme Court's decision in *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), would allow the informants' statements here to be introduced into court without exposing their identity. See def. mem. at 24–25. That fact is irrelevant here. Because the application was prepared and submitted to Chief Judge McGarr in January, 1983, "necessity" must be judged as of that time, not the present. See *supra* note 14. Accordingly, *Inadi* cannot serve as a basis for attack upon the application and authorizing order.

Second, Mancari contends that Zydron's assertion that the informants would not testify under immunity is "pure speculation." That characterization is not entirely true; the conclusion was based on the statements of the informants themselves, who had otherwise proved relatively reliable. In addition, the agent properly considered the effect of broken promises of confidentiality on the flow of information to law enforcement officials both from these informants and from others. Zydron's conclusion in this respect rings of boilerplate, but the concern expressed also rings true. See *McCray v. Illinois*, 386 U.S. 300, 310, 87 S.Ct. 1056, 1062, 18 L.Ed.2d 62 (1967), quoting *Roviaro v. United States*, 353 U.S. 53, 62, 77 S.Ct. 623, 628–29, 1 L.Ed.2d 639 (1957).

Mancari makes a similar argument with respect to the application's consideration of the use of immunity to "flip" one of the conspirators. Here I do find Zydron's conclusion to be "pure speculation." There is simply no factual basis in the application supporting Zydron's assertion that immuni-

ty would be unproductive in achieving this end. What does seem reasonable, on the other hand, was the agent's concern that such an effort might be counterproductive. Any effort to turn a key member of the scheme inevitably risked exposing the investigation to its subjects. The law, as developed in this circuit, does not require that such risks be taken before turning to the more surreptitious means of gathering evidence at issue here. Nor does it compel this court to play the part of Monday morning quarterback; "[p]ost factum suggestions as to how an investigation might have been handled are entitled to little weight in an analysis of statutory compliance with § 2518(1)(c)." *United States v. Orozco*, 630 F.Supp. 1418, 1509 (S.D.Cal.1986).

From the preceding discussion, it should be apparent that I believe that the government has met its burden under *Anderson*. The application here served "to inform the issuing judge of the difficulties involved in the use of conventional techniques" given the facts of this particular case.[15] *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir.1984), *cert. denied*, 469 U.S. 1166, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985) (internal citations omitted). The necessity challenge to the wiretaps must therefore fall.

## II. *Evidence of Crimes Not Specified in the Authorization Order.*[16]

Title III allows disclosure of communications intercepted in conformity with its provisions "in any proceeding held under the authority of the United States...." 18 U.S.C. § 2517(3). Where lawful electronic eavesdropping reveals evidence of crimes "other than those specified in the order of authorization," that material may also be publicly disclosed if a judge first finds,

---

**15.** The government argues that I must accord Judge McGarr's conclusions respecting the necessity of the wiretaps great deference. In support of this position, the government cites cases, few of which say what the government asserts they do. Those that do seem to stand for that proposition are neither binding nor logically persuasive. Indeed, one, in my view, appears to be contradictory. See *United States v. Brown*, 761 F.2d 1272, 1275 (9th Cir.1985) (review of whether application sufficiently alleged necessity is *de novo* while judge's conclusion that wire-

tap was necessary is reviewed for abuse of discretion).

Given my holding above, I need not address the question of what standard of review should be applied in this situation.

**16.** This challenge is directed at suppression of wiretapping in the three cases where mail fraud constitutes the main thrust of the indictment: Nos. 86 CR 707 (Getzendanner, J.), 86 CR 709 (Kocoras, J.), and 86 CR 710 (Nordberg, J.). See def. mem. at 27, n. 7.

based upon an application submitted "as soon as practicable" by the investigating officer, that the conversations were "otherwise intercepted" in accordance with Title III. 18 U.S.C. § 2517(5).

A. The meaning of § 2517(5).

This post-intercept/pre-disclosure requirement is not a mere technicality whose violation is easily cured; it is a "key provision of the legislative scheme...." *United States v. Brodson*, 528 F.2d 214, 216 (7th Cir.1975). In *Brodson*, the Seventh Circuit, through an opinion written by Justice Clark, observed that

> By inserting Section 2517(5) into the Act, the Congress obviously intended to require that the Government submit the tape of its wiretaps to a neutral judge so that he might determine whether the interceptions were the inadvertent product of a legitimately obtained wiretap or the electronic equivalent of the type of illegal evidence formerly obtained under the supposed authorization of a "general search warrant."

*Id.* at 215. *See United States v. Arnold*, 773 F.2d 823, 829 (7th Cir.1985) quoting *United States v. Marion*, 535 F.2d 697, 700–01 (2nd Cir.1976) (post-interception application requirement designed to prevent applicant from naming one crime "while in fact he may have anticipated intercepting evidence of a different crime for which the prerequisites could not be satisfied"); *United States v. Williams*, 737 F.2d 594, 606–07 (7th Cir.1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

■ Judicial approval of the post-intercept application, in turn, requires a finding that "the original order was lawfully obtained, that it was sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order." *Arnold*, 773 F.2d at 829, quoting S.Rep. No. 1097, 1968 U.S.Code at 2189; *Williams*, 737 F.2d at 606. *See also Brodson*, 528 F.2d at 216 (the post-intercept application tests good faith of original application). The government's disclosure of information in violation of this procedure, the Court of Appeals has explicitly held, is grounds for dismissal of the indictment. *Brodson*, at 216.

In recent years, courts have attempted to evade the harsh results compelled by *Brodson* through more "flexible" interpretations of the statute's requirement and the sanctions appropriate for violation of that requirement. With respect to the meaning of § 2517(5) itself, the judicial glosses seem to follow three tracks. Under both Seventh Circuit precedent and the context of this case, this court declines to adopt any of them.

The first of these glosses is the "implicit authorization" approach of *United States v. Tortorello*, 480 F.2d 764 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). This view presumes that electronic investigation of "other crimes" was tacitly approved where a judge, through an extension application or in periodic status reports, was presented with evidence implicating these other crimes. *See United States v. Van Horn*, 789 F.2d 1492, 1503 (11th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986); *United States v. Masciarelli*, 558 F.2d 1064, 1068 (2d Cir.1977). The result of this approach is that new charges need not be approved so long as the collection of evidence pertaining to those charges is approved. *Van Horn*, 789 F.2d at 1503.

The second tack may be called the "similar offense exception." This approach, which focuses exclusively on the congressional purpose in enacting § 2517(5), was first stated (so far as I can tell) in *United States v. Campagnuolo*, 556 F.2d 1209 (5th Cir.1977). As explained by subsequent courts, *Campagnuolo* "appears to permit a more flexible interpretive approach" by relaxing the authorization requirement in cases where the crime for which bugging was approved and the offense for which information was disclosed "were so similar in nature" that it would be unreasonable to believe the original application was a subterfuge. *United States v. Watchmaker*, 761 F.2d 1459, 1470 (11th Cir.1985), *cert.*

*denied, Harrell v. United States,* —— U.S. ——, 106 S.Ct. 879, 88 L.Ed.2d 917 (1986).[17]

Derivative of the similarity of offenses approach is the "integral part" exception. This third approach, which arises in the context of RICO cases, reasons that where an order explicitly authorizes interceptions aimed at RICO predicate acts, it implicitly approves eavesdropping for RICO offenses as well because the latter is merely the aggregation of the former. Thus, interceptions made pursuant to an order listing state narcotics offenses were deemed lawfully disclosed to a federal grand jury investigating RICO violations despite the failure to obtain prior authorization. *Watchmaker,* 761 F.2d at 1470–71. Other cases suggest the converse situation: where a court order explicitly authorizes interceptions pertaining to RICO violations, Title III implicitly allows interceptions relating to predicate acts under RICO. *Cf. United States v. Sedovic,* 679 F.2d 1233 (8th Cir.1982); *United States v. Daly,* 535 F.2d 434 (8th Cir.1976).[18]

That these three approaches violate the letter and spirit of the Seventh Circuit's holding in *Brodson* is unquestionable. That case found irrelevant the degree to which the necessary evidence or constituent elements of the originally listed crimes and the subsequently discovered offenses overlapped. On the contrary, it looked explicitly to the "fact that the Government itself has violated the key provision of the legislative scheme" condemning all public disclosures in violation of the statute. *Brodson,* 528 F.2d at 215. Accordingly, this court must follow that view absent an indication from the Seventh Circuit that the case is no longer good law.

Equally important, the court believes that the reasoning of *Brodson* remains compelling. That the language of § 2517(5) does not speak of "implicit authorization," "sufficiently similar crimes," or "integral parts" is not in dispute. Nor is the fact that Title III placed a rather explicit duty on those seeking to disclose electronically seized communications. Rather, the courts that have sought to liberalize the requirements of § 2517(5) have looked solely to the congressional policy of insuring good faith applications and preventing subterfuge searches to justify the judicially-created exceptions. *See Campugnuolo,* 556 F.2d at 1214; *Watchmaker,* 761 F.2d at 1470; *Masciarelli,* 558 F.2d at 1068.

But such reasoning runs afoul of Judge Posner's admonition that "the policy behind a statute and the statute itself need not be ... identical. Often, legislators, to make doubly sure, draft a statute that goes further than the goal they wanted to achieve; they overshoot the mark to make sure they won't undershoot it." *Federal Deposit Insurance Corp. v. O'Neil,* 809 F.2d 350, 353 (7th Cir.1987). Given the evident care with which Title III was drafted to balance Congress's competing concerns, this criticism seems especially potent here. *See United States v. Giordano,* 416 U.S. at 515, 94 S.Ct. at 1820 ("Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced the clear intent to make doubly sure that the statutory authority be used with restraint ...").

Moreover, even assuming policy considerations alone control the interpretation of the statute, I believe they dictate the rule

---

**17.** The Court of Appeals for the First Circuit applied this logic in *United States v. Smith,* 726 F.2d 852 (1st Cir.1984). There, the wiretap order authorized interception of conversations relating to certain state narcotics offenses. Based on the evidence uncovered, indictments were returned charging federal crimes. In refusing to find that the government violated § 2517(5), the Court explained: "[t]here is no possibility of a subterfuge search here, since the elements of the state offense specified in the authorization are identical to the elements of the federal offense for which the evidence was used." At the same time, however, the court emphasized the

limited nature of its holding: "we think it will be a rare case in which the provisions of federal and state statutes are 'sufficiently similar' to make separate authorization unnecessary." *Id.*

**18.** I label this the "inverse integral parts" view. To my knowledge, no court has actually held this way, but some have come close. See *Sedovic,* 679 F.2d at 1235, and nn. 3, 4; *Daly,* 535 F.2d 434. I mention the pattern, despite the absence of support, because the facts here fall into it and because the defendant raises the question. See def. reply mem. at 8, n. 2.

stated in *Brodson.* A more flexible rule simply eviscerates those policies in certain circumstances. For example, the implicit authorization approach, which claims to respect the statutory purpose of preventing subterfuge searches, in fact makes such searches easier to conduct. It presumes, in its founding court's words, that "a judge ... will scrutinize any application and will scrupulously impose the restrictions required by statute." *Masciarelli,* 558 F.2d at 1068, quoting *Tortorello,* 480 F.2d at 783. In a subterfuge context, however, the assumption is unrealistic. As one court has explained,

> It is not reasonable to assume that a judge reviewing a request for an extension of wiretap order will search for evidence of crimes not specifically cited therein and determine whether they meet the requirements of § 2518(1), without a prosecution request to do so.

*Orozco,* 630 F.Supp. at 1529 n. 13.

This fear seems especially justified in the RICO context. By my count, there are over fifty different types of "racketeering activity" under the RICO statute. See 18 U.S.C. § 1961(1). Under either the "implicit authorization" or the "inverse integral parts" view, an agent authorized to investigate a RICO violation involving one type of predicate offense has license to listen to *and disclose* evidence uncovered concerning any other racketeering act—without necessarily having to return to court to demonstrate his good faith. The problem lies in the perverse mixture of the "same real offense" analysis applied by the exceptions and the breadth of criminality that a RICO authorization order encompasses. The result is a dramatic expansion of the government's ability to wiretap or bug without judicial safeguard.[19]

Even on policy grounds, then, these "flexible" rules seem far less preferable than *Brodson*'s clearcut approach. Accordingly, I believe that *Brodson* remains both rationally compelling and legally in force, despite aspersions cast on the case by other circuits. With the meaning of § 2517(5) established, then, I turn to the defendant's claim.

### B. § 2517(5) Applied.

Mancari raises three arguments in support of its motion to dismiss the indictment or, alternatively, suppress evidence gleaned from the wiretaps.[20] The first asserts that, given the October 1, 1986 date of Chief Judge Grady's post-intercept order, any prior use of the intercepted communications or evidence derived from those interceptions before the grand jury mandates dismissal of the tainted indictments.

---

**19.** The facts of this case illustrate precisely how such expansion would undercut the statute's policy of judicial review. Here, agent Zydron's application stated there was probable cause to believe Mancari and associates were involved in interstate transportation of stolen property, "an enterprise involving a pattern of racketeering activity," and conspiracy to do these things. App. at 2–3. Although use of the mails is mentioned as *one* facet of the "scheme described," the crime of mail fraud is not specifically mentioned. That may be because mail fraud was not an enumerated authorizing offense at the time the application was made. See *infra* note 22. Whatever the reason, these facts suggest that Judge McGarr did not consider whether probable cause and investigative necessity justified eavesdropping for mail fraud independent of the RICO claim. Certainly, the court's order gives no hint to the contrary. See Order of Jan. 20, 1983. Yet despite this absence of a prior probable cause finding or judicial probing of the agent's good faith, the material may have been disclosed.

**20.** The defendant's initial memorandum attacked the government's failure to obtain a § 2517(5) post-intercept order permitting use of other crimes evidence uncovered—an understandable assertion considering the government's failure to mention the existence of such an order in the 2.04 conference mandated by this court's local rules. The government's brief response asserted that a proper application and order was "filed and signed before the return of any indictments in this case." If this is true, it is only by the slenderest of margins; the documents submitted by the government indicate that the post-intercept application and order were first *presented* to Chief Judge Grady on the day that the indictments were returned. Compare appendix to gov. mem. at exs. A & B with def.'s appendix A at exs. 1–4. In any event, this response prompted the three arguments discussed *infra,* to which the government has not replied.

■ The point is persuasive. The grand jury in these cases returned their indictments against Mancari on October 1, 1986. From the documents submitted by the government, it appears that the post-intercept application and draft order was submitted to Chief Judge Grady on that same day. Given this chronology and the rule articulated by Justice Clark in *Brodson*, I conclude that any disclosure of intercepted conversations pertaining to mail or wire fraud (or any information derived from such interceptions) to the grand jury prior to the date of the Chief Judge's order violates Title III.

In light of the foregoing, the government is ordered to immediately advise the court whether it did, in fact, make such disclosures before the grand jury. Should this be the case, the parties will be ordered to brief the question of appropriate relief.[21] I will suspend judgment concerning Mancari's other two arguments until after the resolution of this issue.[22]

### III. *Probable Cause.*

Mancari challenges Chief Judge McGarr's findings of probable cause justifying electronic surveillance respecting two of the cases against him. In one, No. 86 CR 709 (Kocoras, J.), the defendant asserts that the original application shows "a patent absence of probable cause" to intercept conversations relating to insurance fraud involving the U.S. mails. Def. mem. at 42. In the second, No. 86 CR 708 (Leinenweber, J.), he argues that the extension application lacked probable cause to intercept conversations relating to narcotics. Mancari asks this court to suppress evidence derived from the wiretap in both cases.

Probable cause, as the Supreme Court has repeatedly emphasized, is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). It is commonly defined as facts and circumstances which would lead a reasonably prudent man to believe that "criminal activity was afoot." *Dorfman*, 542 F.Supp. at 359, citing *Berger*, 388 U.S. at 55, 87 S.Ct. at 1881. As such, its existence is to be determined in a pragmatic, nontechnical way based on the totality of circumstances before the authorizing magistrate. *Gates*, 462 U.S. at 230–32, 103 S.Ct. at 2328–29.

What this standard boils down to, in essence, is a common sense appraisal by a neutral and detached official of the situation at hand. And that appraisal, the Court has also made clear, is to be given "great deference" on review. *Id.* at 236, 103 S.Ct. at 2331. Indeed, the task of a reviewing court "is simply to ensure that the magistrate has a substantial basis for concluding that probable cause existed." *Id.* at 238–39, 103 S.Ct. at 2332 (internal citations omitted).[23]

There is, as Mancari points out, evidence that the probable cause standard is somewhat more rigorous in the context of electronic surveillance. In discussing Fourth Amendment limitations on such investiga-

---

**21.** To this end, the parties are advised to consider the Supreme Court's decision in *United States v. Donovan*, 429 U.S. 413, 433–34, 97 S.Ct. 658, 671, 50 L.Ed.2d 652 (1977) and the various approaches taken by the courts to the problem. See, *e.g.,* discussion in *Orozco*, 630 F.Supp. at 1529–31.

**22.** The second argument contends that the § 2517(5) application and order "ran afoul" of the statutory requirement that the order be obtained "as soon as practicable." In the third, Mancari contends that because mail and wire fraud charges were not offenses justifying a wiretap under Title III at the time the government obtained the original order in this case, the original application must have been a subterfuge calculated to avoid the enumerated crime restriction of the statute. (Congress has recently amended Title III to permit interception of communications relating to mail and wire fraud. See Pub.L. 99–508, § 105(a)(E) (1986); Pub.L. 98–473, § 1203(c)(1) (1984). These amendments, passed well after Chief Judge McGarr's initial order here, have no bearing on the cases here.)

**23.** Of course, "a mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause" is insufficient. The magistrate's "action cannot be a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239, 103 S.Ct. at 2333.

tions, the Supreme Court observed in *Berger* that "[t]he need for particularity and evidence of reliability in the showing required when judicial authorization of a search is sought is especially great in the case of eavesdropping." 388 U.S. 41, 56 (1967). Justice Stewart, concurring in the Court's opinion, wrote to specifically emphasize the point:

The need for particularity and evidence of reliability in the showing required when judicial authorization is sought for the kind of electronic eavesdropping involved in this case is especially great. The standard of reasonableness embodied in the Fourth Amendment demands that the showing of justification match the degree of intrusion. By its very nature electronic eavesdropping for a 60-day period, even of a specified office, involves a broad invasion of a constitutionally protected area. Only the most precise and rigorous standard of probable cause should justify an intrusion of this sort.

*Id.* 388 U.S. at 69, 87 S.Ct. at 1888.

Incorporating these concerns, Title III bars authorization of electronic interception of communications absent facts in the investigating officer's affidavit showing

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in [Title III],

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception,

\*       \*       \*       \*       \*       \*

(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3). See S.Rep. No. 1097, 1968 U.S.Code at 2191. (Together, these sections "are intended to meet the test of the Constitution that electronic surveillance techniques be used only under the most precise and discriminate circumstances, which fully comply with the requirement of particularity.")

■  Applying these principles, the defendant challenges the "probable cause to authorize highly intrusive surreptitious electronic seizure of communications emanating from Mancari's telephone line regarding the alleged insurance mail fraud." Def. mem. at 43. This argument is without merit. Chief Judge McGarr never issued an order approving interception of conversations relating to mail fraud. See supra note 19. Consequently, any attack on that order's basis in probable cause is illusory.[24]

■  The defendant's second probable cause argument concerning intercepts of narcotics conversations approved by Chief Judge McGarr's extension order, is also unpersuasive. The extension affidavit summarizes conversations intercepted pursuant to the initial order. See ext. app. at 6. These conversations contain multiple references to "stuff," "green stuff," "green stamps," "green sheets," "white sheets," and "white stuff"—all of which Zydron's extension application claims are code words denoting illicit drugs.

The application sets forth facts supporting this conclusion. In the first place, the conversations containing these words uniformly indicate a purchase/sale context, with discussions centering on price and quantity. That a code was involved is also suggested by the lack of a common sense meaning for the words used: the authorizing judge may well have considered why Mancari would ask defendant John Demma about the availability of "green sheets" or the price of "white sheets"—especially when there is no indication that either was

---

**24.** In this regard, the government correctly notes that Title III anticipates situations where agents monitoring for one crime uncover evidence of another. Gov. mem. at 18. See 18 U.S.C. § 2517(5) and discussion *supra,* part II. As I have indicated above, there is serious question whether the government followed that statutory procedure.

involved in the bedding industry. See ext. app. at 5859.[25]

A second factor supporting Zydron's conclusion is the agent's familiarity with the shadowy terrain that composes the narcotics underworld. In the application, Zydron notes that "white stuff" is a word "often used by area drug users to describe cocaine" and that "stuff" is "often used for illicit or narcotic drugs." Ext. app. at nn. 7, 28. It was reasonable for Chief Judge McGarr to give some deference to the agent's understanding of the street meaning of those terms.

That the conversations probably referred to drugs is, in the final analysis, evidenced by the conversation between Mancari and defendant William Hill[26] on January 20, 1983. There, according to the application,

> Mancari also admitted to Hill that he still deals in "dope" whereupon Mancari and Hill discussed the prices of "green stuff." Mancari quoted 4¼ a pound and that the purchase had to be made in quantity.

Ext. app. at 22. Mancari's use of the word "dope" (which even Webster's defines as a "narcotic or habit-forming drug") in the context of "green sheets" gives significant weight to Zydron's belief that Mancari was involved with illicit drugs. Webster's Third New Int'l Dictionary, at 674, definition 4a (1976). Taken together with the other two reasons articulated above, I find that Chief Judge McGarr had a substantial basis for his conclusion that Zydron's application indicated probable cause.

## IV. *Veracity of the Application.*

In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court found that the Fourth Amendment entitles a defendant to challenge the factual allegations in a warrant application in certain circumstances undercutting the presumption of veracity accorded such applications. Those circumstances, the court held, are present where the defendant makes "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* at 155–56, 98 S.Ct. at 2676. If such statements are deemed material, in the sense that they are necessary to the magistrate's finding of probable cause, *Franks* requires that the defendant be given the opportunity to challenge the affiant's statements in a hearing. Should the hearing establish, by a preponderance of evidence, that these statements were, in fact, perjurious or recklessly made, the warrants based on them must be voided if the affidavit's unchallenged content fails on its own to establish probable cause. *Id.*

Although the Supreme Court did not define what it meant by the phrase "reckless disregard of the truth," the Seventh Circuit, analogizing from the first amendment context, has explained that proof of reckless disregard entails a showing that the affiant "in fact entertained serious doubts as to the truth of his allegations." *United States v. Williams*, 737 F.2d 594, at 602 (1984) (internal citations omitted). This, in turn, may be inferred from "circumstances evincing obvious reasons to doubt the veracity" of the affiant's claims. *Id.*

The logic of *Franks*, the *Williams* court also held, allowed challenges to affidavits on the grounds the affiant deliberately withheld or recklessly omitted to present material facts to the authorizing magistrate. *Id.* at 604.

> Doubtless it will often be difficult for an accused to prove that an omission was made intentionally or with reckless disregard rather than negligently unless he somehow gained independent evidence

---

**25.** The conspirators' predisposition to use street language or code is also illustrated by the multiple references in the application to the "heat" or "G." One need only the most cursory knowledge of television crime programs to know that such terms popularly refer to law enforcement and federal law enforcement officers in particular. See *Gates*, 462 U.S. at 232, 103 S.Ct. at 2329. (Probable cause deals with the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.")

**26.** Hill is a defendant in No. 86 CR 707 (Getzendanner, J.); he is not charged, so far as this court is aware, with drug offenses. See No. 86 CR 708 (Leinenweber, J.).

that the affiant had acted from bad motive or recklessly in conducting his investigation and making the affidavit. Nevertheless, it follows from *Franks* that the accused bears the burden of showing by a preponderance of the evidence that the omission was more than a negligent act. It is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from the omission itself.

*United States v. Martin,* 615 F.2d 318, 329 (5th Cir.1980); *Dorfman,* 542 F.Supp. at 368, n. 20 ("in practice it will be very difficult for a defendant to make the necessary showing").

In addition to this state of mind requirement, the omission must be material; "that is, if the fact were included, the affidavit would not support a finding of probable cause." *Williams,* 737 F.2d at 604. Because this standard allows the defendant to put forward exculpatory information never considered by the magistrate, the Court of Appeals has stated that the government may come forward with additional inculpatory matter known to the affiant at the time he presented the application. *Id.*

In the present case, Mancari suggests that "at least" two falsehoods are contained in agent Zydron's application. The first concerns Zydron's assertion that Mancari and others were arrested by Rosemont, Illinois, police and found in possession of a fraudulent vehicle registration card. App. at 9–10. The statement is misleading, the defendant claims, because the application failed to mention that the charges stemming from the arrest were dismissed. See def. appendix B. ex. 16. It is material, he adds, given that a fraudulent title scheme is at issue in No. 86 CR 707 (Getzendanner, J.).

■ Although I agree that this omission was somewhat misleading, there is *nothing* to suggest that the lapse was intentional or reckless—much less that the statement was not in fact true. The application states only that Zydron learned of Mancari's Rosemont arrest from Chicago police detective Joan Gustafson, who "re-called" that Mancari was found in possession of an automobile registration card issued to one "Charles Farley" at a nonexistent address. Moreover, this possession offense seems a minor one, and dismissal of it does not necessarily suggest that the charged events did not occur; it may simply be that the prosecutor chose to concentrate efforts on more important matters. Hence, the fact of nondisclosure itself cannot be deemed recklessness fatal to the determination of probable cause.

More importantly, I doubt that the information would have made much of an impression on Chief Judge McGarr considering the crimes for which the application sought authorization to wiretap. As I have explained above, these did not include mail fraud. And that there was probable cause to investigate these other crimes is beyond question: the application enumerates facts generated by police surveillance, information provided by confidential informants, and evidence uncovered corroborating that information which strongly suggests the existence of a widespread criminal scheme. Given the common sense appraisal that is the probable cause determination, I cannot find that the omission here was material.

■ The question of Mancari's second claimed omission is more difficult. Zydron's affidavit claims that Chicago Police Sergeant Patrick McCafferty

advised affiant that on February 3, 1982, [Chicago police] Detectives executed a search warrant at a commercial garage.... [T]hat upon executing the above search warrant, Bruno J. Mancari [and other defendants here] were observed in the premises. ... [T]hat several stolen vehicles, assorted tools, cutting torches and gauges were found and seized by [the] Detectives.... [T]hat Mancari [and the others] were subsequently arrested for auto theft related charges by [the] Detectives on February 3, 1982.

App. at 21–22. Zydron also learned that an automobile recovered from the garage had been sold, as had others, by Midwest Auto to a purchaser (or purchasers) using fictitious names. What the affidavit failed to

relate, however, was that Mancari was *acquitted* of charges stemming from these incidents.

I find this omission shocking. The application makes much, either directly or indirectly, of the information uncovered by the February search. Indeed, with the exception of pen registers—which show nothing in themselves other than mere association—this material provides the only corroboration of information provided by Confidential Informant #1. As such, the fact of Mancari's acquittal brings into question the reliability of that informant, of whom agent Zydron stated

> Information furnished by confidential informant number one has resulted in the recovery of a stolen vehicle and one indictment ... [and has] also contributed toward establishing the probable cause which resulted in the issuance of a state search warrant on a premises concealing stolen automobiles. At least two indictments resulted from the execution of this search warrant.

App. at 13.

Considering the importance of Confidential Informant #1 to the application's showing of probable cause,[27] I believe that the defendant may be entitled to a *Franks* hearing. He has presented evidence of an omission (the acquittal) that is unquestionably relevant to the probable cause analysis. And while it is true that Mancari has presented no evidence of an intentional scheme to mislead Chief Judge McGarr, the fact of acquittal is not the type of data a reasonable person would forget to bring to the judge's attention. Hence, I believe that the fact of omission itself may "evince obvious reasons to doubt the veracity" of the application.[28]

I couch my language in uncertainty here because I suspect there may be an innocent explanation for Zydron's lapse. It may be—although the government does not raise the point—that Zydron did not know or could not have known of the acquittal. The affidavit submitted by the defendant as evidence of that verdict does not indicate the date the judgment was handed down. See def. appendix B. ex. 17. If the acquittal came down after the date of the application, it obviously cannot be the basis of a *Franks* challenge. The government, which is apparently in control of the relevant records, is therefore instructed to provide the court with this information immediately. Since their resolution may not be necessary, discussion of the remaining *Franks* issues is deferred until this question is settled.

## V. *Minimization.*

In addition to the foregoing, Title III requires that every electronic surveillance order mandate that the authorized bugging "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter...." 18 U.S.C. § 2518(5). Often called the "minimization requirement," the provision expresses congressional intent that the government do "all that it could to avoid unnecessary intrusion" by the surveillance team. *United States v. Suquet,* 547 F.Supp. 1034, 1036 (N.D.Ill.1982) (Getzendanner, J.), quoting *United States v. Quintana,* 508 F.2d 867, 874 (7th Cir.1975). Any inquiry into the government's behavior under this standard necessarily depends on the facts and circumstances of each case. *Scott v. United States,* 436 U.S. 128, 140, 98 S.Ct. 1717, 1724–25, 56 L.Ed.2d 168 (1978).

---

**27.** The information provided by Confidential Informants #3 and #4 is far less particularized and therefore far less convincing than that provided by Informant • 1. Informant's #2's information is detailed, but seems to expose a different facet of the enterprise.

**28.** Given the seriousness of this lapse, the court is disturbed by the government's summary treatment of the issue. That response merely asserts

that "a common sense reading of the affidavit reveals that these omissions were hardly material." That may be true, but the government makes no attempt to explain, in detail, the basis for that conclusion. Such detail seems necessary given the suspicion the acquittal casts on Informant #1. In any event, I will defer consideration of this issue for the reasons stated in text, *infra.*

To this end, courts have developed numerous factors to consider in determining whether minimization was achieved in a given situation. Those considerations are set forth in detail in this court's opinion in *Suquet*, 547 F.Supp. at 1036, *et seq.*, and Judge Marshall's decision in *Dorfman*, 542 F.Supp. at 389, *et seq.* Taken together, the cases show the wide latitude government agents must be accorded in intercepting calls given the realities of electronic surveillance. They also describe the corresponding legal and evidentiary difficulties faced by a defendant challenging the government's minimization and the courts' refusal to impose vigorous sanctions in all but the most egregious cases.

These difficulties only arise, however, after the government makes "a prima facie showing of reasonableness." *Suquet*, 547 F.Supp. at 1042, n. 19, quoting *Quintana*, 508 F.2d at 875. That has not yet happened in this case. Although many of the factors articulated by *Dorfman* and *Suquet* support the use of widespread surveillance here, there is no evidence before the court suggesting that reasonable efforts were made by the monitoring agents to minimize in light of these legitimate considerations.

All that the government has presented on this point are the intercept status reports submitted to Chief Judge McGarr by the United States Attorney. See gov. appendix group exhibit C. These representations to the court, which were not based on personal knowledge, are not evidence capable of constituting a "prima facie showing of reasonableness." Equally important, they suggest that minimization guidelines here may have been ignored, especially with respect to conversations between Mancari and his wife. See def. reply mem. at 11 and attached chart. To this end, the court is concerned that interception between Mancari and his wife appears to have continued beyond the period of the first authorization order despite the government's failure to list her in the extension application.

Accordingly, I grant the defendant's request for a minimization hearing. As the defendant fairly observes, access to information regarding the minimization issue is exclusively within the province of the government. Def. reply at 10. The government must come forward with at least some of that information so as to show that the government established steps to prevent overhearing of innocent conversations and made reasonable efforts, considering the circumstances, to follow those measures. Only after this will the ultimate burden on the issue shift to Mancari. *Quintana*, 508 F.2d at 875.

### Conclusion

For the reasons stated herein, Mancari's motion to dismiss is granted in part and denied in part. The government is ordered to respond *immediately* to the question posed by the court in part II of this ruling concerning the improper disclosure of intercepted communications. It is also directed to inform the court of the date of Mancari's acquittal in the state auto theft action discussed above in part IV. A hearing or additional briefing may be ordered depending on the government's response to these questions.

In any event, the court will hold a hearing on the minimization issue for the reasons stated in part V of this opinion. That hearing will be scheduled at the status conference before the court on May 14, 1987. At that time the parties should also be prepared to discuss the standing question raised in note 3 below.

It is so ordered.