UNITED STATES of America, Plaintiff,

v.

Kevin P. O'NEILL, et al., Defendants.

No. 97–CR–98.

United States District Court,
E.D. Wisconsin.

Oct. 19, 1998.

William O. Marquis, Milwaukee, WI, for Kevin P. O'Neill.

Ann T. Bowe, Milwaukee, WI, for Carl J. Warneke.

Edward J. Hunt, Milwaukee, WI, for Raymond L. Morgan, Jr.

Daniel Resheter, Jr., Milwaukee, WI, for Robert A. Kruppstadt.

Michael R. Barth, Brookfield, WI, for Richard E. Mroch.

James C. Reiher, Milwaukee, WI, for Johnson F. Blake.

Thomas G. Halloran, Milwaukee, WI, for William B. Brock.

Robert J. Penegor, Brookfield, WI, for James E. Hanson.

Pamela Pepper, Milwaukee, WI, for Allen J. McVay.

Robert LeBell, Milwaukee, WI, for James E. Meinen, Jr.

Franklyn Gimbel, Milwaukee, WI, for Randall E. Miller.

Christopher T. Van Wagner, Madison, WI, for Harvey E. Powers.

Dean A. Strang, Milwaukee, WI, for James C. Rostron.

Charles W. Giesen, Madison, WI, for Leslie John Jensen.

## ORDER

STADTMUELLER, Chief Judge.

On June 3, 1998, Magistrate Judge William E. Callahan, Jr. issued a recommendation and order addressing the second round of pretrial motions ("Round II") in the above-entitled case. The second round of pretrial motions includes motions to suppress and motions to dismiss based upon evidentiary arguments. Pursuant to 28 U.S.C. § 636(b)(1)(A), the defendants filed objections to the magistrate's recommendation and order. On July 30, 1998, the government filed its response to many of the defendants' objections. The court will address the issues in the same order as presented by the magistrate where possible.

### I. Motions Regarding the Title III Intercepts

Magistrate Callahan denied defendant Kevin P. O'Neill's "Motion for Discovery Related to Motion to Suppress Title III Evidence" (joined by defendant Meinen), Recommendation and Order at 57, and recommended the denial of O'Neill's "Omnibus Motion to Suppress Evidence Intercepted or Gathered under Title III" (joined by defendants Kruppstadt, McVay, Meinen, Powers, and Blake). Recommendation and Order at 25, 27, 41, 50, 55. O'Neill now objects to the magistrate's Recommendation and Order at, inter alia, pages 25, 27, and 41.

### A. Probable Cause and Title III Intercepts, Recommendation and Order at 25–26

■ Magistrate Callahan recommended the rejection of O'Neill's motion to suppress to the extent that such motion was grounded on the argument of the lack of probable cause and/or lack of necessity. Recommendation and Order at 25. The entirety of O'Neill's objection to the recommendation regarding alleged lack of probable cause is as follows:

> Before a Title III order is given, an application must demonstrate probable cause (sec.2518(1)(b) and (3)[sic]). This

must include probable cause to [sic] the individuals, or targets, to [sic] the particular communications, and to [sic] the particular facilities. Based upon his motion and prior brief and memorandum, Defendant O'Neill objects to and disputes the Magistrate's findings, and ultimate ruling as proclaimed at page 25.

Defendant O'Neill's Memorandum in Support of Objections to the Magistrate's Recommendation and Order (Second Submission on Objections to the Order) (hereinafter "O'Neill's Second Objections") at 3–4.

■■■ Generalized objections, absent specific legal authority, do not invoke the district court's obligation to perform a *de novo* review of a magistrate's decision: *"De novo* review of a magistrate judge's recommendation is required only for those portions of the recommendation for which particularized objections, accompanied by legal authority and argument in support of the objections, are made." *Banta Corp. v. Hunter Publ'g Ltd.*, 915 F.Supp. 80, 81 (E.D.Wis.1995). "[W]ithout specific reference to portions of the magistrate's decision and legal discussion on the objected portion, the district court's duty to make a *de novo* determination does not arise. The general statements that a party 'objects' and 'incorporates all arguments previously made to the magistrate' will not suffice." *United States v. Molinaro*, 683 F.Supp. 205, 211 (E.D.Wis.1988); *see also Thomas v. Arn*, 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985) (holding that "[s]ection 636(b)(1)(C) . . . does not on its face require any review at all . . . of any issue that is not the subject of an objection").

Therefore, defendant O'Neill's generalized objection to the recommendation regarding alleged lack of probable cause does not invoke this court's duty to review the magistrate's recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 13.03(c). For this reason, the court will not perform a *de novo* review and will therefore adopt the magistrate's recommendation to deny O'Neill's motion to suppress to the extent that such motion was grounded on the argument of lack of probable cause.[1]

■■ O'Neill also objects to the magistrate's recommendation that this court reject O'Neill's motion to suppress to the extent that such motion was grounded on the argument of lack of necessity. Recommendation and Order at 25. O'Neill's objection to this recommendation is also quite succinct:

> Defendant O'Neill has made extensive arguments on this issue in prior submissions, and will not duplicate them here, but asks that this Court review these carefully in addressing this issue. One major theme presented there is that the necessity portions of the applications are nearly identical in each application and continuing applications. These are not only redundant, but they are all based on affidavits signed by a witness whose credibility has been called into question around [sic] these issues. Yet the Magistrate, in reviewing this issue, simply takes statements from this agent's affidavits as explanation as well as findings that necessity exists. Such reliance is misplaced and insufficient. This Court must have a hearing on the true "necessity" of these Title III intrusions.

O'Neill's Second Objections at 4–5.

As stated above, general statements of objection and blanket references to arguments previously made to the magistrate will not suffice. *See Molinaro*, 683 F.Supp. at 211. Regarding O'Neill's argument that the identity of necessity sections of the surveillance applications somehow calls their validity into question, O'Neill has not presented any legal support for this argument. If anything, the consistency and thoroughness of these sections indicates that the government exhausted all other possible avenues of investigation, which, as Magistrate Callahan noted, is the important issue here. Regarding O'Neill's cursory argument that the credibility of the witness who signed the affidavits supporting the surveillance applications "has been called into question," the court refuses to reject the magistrate's well-reasoned and comprehensive recommendation regarding necessity on the basis of such a flimsy and unsupported

---

1. In light of the magistrate's exhaustive listing of factors supporting probable cause, it is difficult to imagine any predicate for O'Neill's objection. *See* Recommendation and Order at 11–17.

accusation. Therefore, the court will adopt the magistrate's recommendation to deny O'Neill's motion to suppress to the extent that this motion was grounded on the argument of lack of necessity.

## B. Use of Evidence to Prove Crimes Not Listed In Intercept Orders, Recommendation and Order at 27–40

■ O'Neill also objects to the magistrate's recommendation to deny O'Neill's motion to suppress to the extent the motion argues that all electronic surveillance applications and orders are invalid because they refer to 18 U.S.C. § 842(h), a crime not specified in Title III, 18 U.S.C. § 2516(1) (section 2516(1) lists offenses for which orders authorizing electronic surveillance may be granted). O'Neill's objection to this recommendation is the shortest of all of his objections—in response to the magistrate's statement that inclusion of section 842(h) does not mean that all interceptions are to be suppressed, O'Neill simply states that "defendant disputes this, and wonders aloud what remedy should be employed for such a violation. The order is silent." O'Neill's Second Objections at 9–10.

■ O'Neill's verbal ruminations are no substitute for legal analysis and citation to authority. O'Neill offers no support for his argument that inclusion of a reference to a non-listed offense in the surveillance authorizations completely invalidates those authorizations. Indeed, relevant authority indicates that quite the opposite is true. *See United States v. Marcy,* 777 F.Supp. 1400, 1403 (N.D.Ill.1991) (holding that "the government may use lawfully obtained wiretap evidence to prove crimes not specified in the wiretap order, and may do so even if those crimes are not specifically targeted by Title III"). As Magistrate Callahan notes, all of the other numerous offenses listed in the surveillance applications and authorizations are listed in section 2516(1). Recommendation and Order at 25. Therefore, the court will adopt the magistrate's recommendation to deny O'Neill's motion to suppress to the extent the motion argues that all electronic surveillance applications and orders are invalid because they refer to 18 U.S.C. § 842(h).

■ O'Neill further objects to the recommendation to deny O'Neill's motion to suppress to the extent the motion argues that the evidence gathered through the surveillance relates to crimes not specified in the authorizing orders and for which the government had not sought subsequent authorization. The magistrate first held that although the government charged defendants with crimes not specified in the original surveillance authorizations, these crimes involve the same facts and elements as those listed in the original surveillance authorizations, so defendants "cannot be harmed" by the government's failure to seek subsequent authorizations. Recommendation and Order at 27. The magistrate then held that even if the government should have sought subsequent authorization, it "is not precluded from yet obtaining such an order authorizing the use of such evidence at trial." *Id.* O'Neill attacks only the second part of this recommendation, arguing that it is too late now for the government to seek subsequent authorization. O'Neill's Second Objections at 9.

■ Government agents must seek subsequent authorization for wiretaps relating to crimes not specified in the original authorizing order before seeking an indictment regardless of the similarity between crimes that are specified in the original order and those that are not. *United States v. Brodson,* 528 F.2d 214 (7th Cir.1975). In *Brodson,* the government charged the defendant with violations of 18 U.S.C. § 1084; however, the original wiretap order "only authorized interceptions covering violations of 18 U.S.C. § 1955." 528 F.2d at 215. The government did not apply for subsequent authorization under 18 U.S.C. § 2517(5) until just prior to trial—some eight months after the grand jury returned its indictment. *Id.* The Seventh Circuit upheld the district court's dismissal of the indictment, holding that the government should have sought subsequent authorization before submitting the evidence to the grand jury:

> Here, the Government's claim, that the authorizations applicable to the Section 1955 violations were also relevant to Section 1084 violations, should have been tested by submitting them to a judge in accor-

dance with the rationale of Section 2517(5). This the Government failed to do within the time requirement of 'as soon as practicable' that the Section specifies. Moreover, without submitting to the requirements of Section 2517(5), the Government disclosed the intercepted conversations to the Grand Jury.

*Id.* at 215. The court explicitly rejected the government's argument that it did not need subsequent authorization because of the similarity of the offenses, stating that "[t]he controlling factor here, however, is not the dissimilarity of the offenses, but the fact that the Government itself has violated the key provision of Section 2515, in that it did not comply with the mandate of Section 2517(5)." *Id.* at 216.[2]

Courts in the Seventh Circuit interpreting *Brodson* have rejected the idea that authorization for eavesdropping regarding RICO predicate acts implicitly includes authorization for eavesdropping regarding RICO offenses, *see United States v. Mancari,* 663 F.Supp. 1343 (N.D.Ill.1987), the exact holding proposed by the magistrate in this case. *See* Recommendation and Order at 27.[3] The *Mancari* court rejected this approach, deeming it inconsistent with *Brodson* :

In recent years, courts have attempted to evade the harsh results compelled by Brodson through more "flexible interpretations ... [The] third approach, which

arises in the context of RICO cases, reasons that where an order explicitly authorizes interceptions aimed at RICO predicate acts, it implicitly approves eavesdropping for RICO offenses as well because the latter is merely the aggregation of the former. . . . That these three approaches violate the letter and spirit of the Seventh Circuit's holding in Brodson is unquestionable. That case found irrelevant the degree to which the necessary evidence or constituent elements of the originally listed crimes and the subsequently discovered offenses overlapped."

663 F.Supp. at 1351–52.

All is not lost for the government, however, as the Seventh Circuit has distinguished *Brodson* where (1) the indictment merely adds grounds to the original wiretap authorization, as in this case, rather than indicting a defendant on wholly different grounds, as in *Brodson;* and (2) the government voids the first indictment, seeks subsequent authorization, and then brings the case before a second and uninfected grand jury, which may then indict a defendant again, rather than, as in *Brodson,* waiting until eight months after presenting the information to a grand jury to seek subsequent authorization. *See United States v. Shields,* 999 F.2d 1090, 1097 (7th Cir.1993), *cert. denied, Shields v. United States,* 510 U.S. 1071, 114 S.Ct. 877, 127 L.Ed.2d 74 (1994).[4]

---

**2.** The Seventh Circuit also has required that (1) the original authorization order was lawfully obtained, (2) it was sought in good faith and not as a subterfuge search, and (3) the questionable communication was incidentally intercepted during the course of a lawfully executed order. *United States v. Arnold,* 773 F.2d 823, 829 (7th Cir.1985). However, O'Neill has not raised these points in his objection; therefore, the court will not consider them.

**3.** The magistrate also cited *United States v. Marcy,* 777 F.Supp. 1400, 1403 (N.D.Ill.1991), in support of this proposition. However, the magistrate quoted from a section of *Marcy* discussing whether the government could use wiretap evidence regarding crimes not listed in 18 U.S.C. 2516(1), not whether the government could use evidence regarding crimes not listed in the original wiretap authorization order. *Id.* Furthermore, *Marcy* is distinguishable because the government has not sought a superseding indictment after obtaining subsequent authorization in this case, as the government did in *Marcy* : "We . . .

find that, particularly where the government has brought a superseding indictment after obtaining a § 2517(5) disclosure order, dismissal of the indictment or suppression of certain wiretap evidence is not appropriate." *Id.*

**4.** The *Shields* court hinted that it may be moving away from *Brodson's* rejection of the "integral parts" theory propounded by the magistrate in this case, holding that:

[T]he [added] charges were based on the same set of facts as the [offense listed in the original wiretap authorization]. Since the government was free to release this information to a grand jury anyway under the [initial] authorization, it is difficult to see how the defendants were harmed when the same facts were presented in the context of different offenses.

999 F.2d at 1097. However, this statement was only part of a holding that emphasized the importance of obtaining a subsequent authorization and superseding indictment rather than allowing the government to prosecute a defendant on the

Therefore, pursuant to Seventh Circuit precedent, the government must seek subsequent authorization to add the additional offenses charged in the first indictment to the wiretap order, dismiss the first indictment against the defendants, and pursue a superseding indictment before a second and uninfected grand jury.

Because, pursuant to *Brodson,* the entire indictment must be dismissed, those defendants detained on these charges would normally be entitled to release from custody. However, the court may stay their release pending the procurement of a superseding indictment or an appeal of the dismissal of the pending indictment. *See United States v. Alfonso,* 143 F.3d 772 (2d Cir.1998). Therefore, the court will provisionally order that all defendants detained on the offenses charged in the indictment be released from custody; however, the release order will be stayed for a period of 30 days to allow the government an opportunity to consider an appeal or seek a superseding indictment after compliance with 18 U.S.C. § 2517(5). If the government chooses to appeal or to seek a *superseding indictment, it must move for* an extension of the stay or move the court to vacate the release order once an untainted grand jury has returned a superseding indictment.[5]

### C. Minimization, Recommendation and Order at 41–49

■ O'Neill objects to the magistrate's recommendation to deny O'Neill's motion to suppress to the extent the motion argues that the government failed to minimize the interceptions of wire and oral communications as required by Title III. O'Neill admits that the magistrate addressed this issue "at considerable length" but argues that his motion should have been granted because the government submitted conflicting evidence regarding the number of calls considered "pertinent illegal" or "other illegal."

As the magistrate correctly held, the defendants bore the burden to rebut the government's prima facie showing of minimization, which they did not even attempt to do. Recommendation and Order at 41. It is defendants' burden to establish a pattern of interception of innocent conversations, *see United States v. Dorfman,* 542 F.Supp. 345, 390 (N.D.Ill.1982), *aff'd,* 737 F.2d 594 (7th Cir.1984), and O'Neill's assertion that the government submitted allegedly inconsistent wiretap statistics falls far short of satisfying that burden. Therefore, the court will adopt the magistrate's recommendation to deny O'Neill's motion to suppress to the extent that such motion was grounded on the argument of lack of minimization.

basis of a faulty indictment. *Id.* Therefore, although the court believes that the *Brodson* rule is unduly harsh and that "the rationale behind section 2517(5) is outdated," *see* John D. LaDue, *Electronic Surveillance and Conversations in Plain View: Admitting Intercepted Communications Relating to Crimes Not Specified in the Surveillance Order,* 65 NOTRE DAME L. REV. 490, 519 (1990), the court finds that Seventh Circuit precedent requires the government to obtain an untainted superseding indictment.

5. If the government chooses to appeal this dismissal under 18 U.S.C. § 3731, this court will continue to consider and rule on the balance of the magistrate's Round II and Round III recommendations and orders during the pendency of the appeal. Although appeals typically divest this court of jurisdiction, the court may continue to rule on issues unrelated to those appealed:

The next question is whether the government's appeal divested the district judge of jurisdiction to rule on the rest of the motion to suppress. The general rule, and it is applicable to appeals under section 3731, is that an appeal transfers jurisdiction from the district court to

the court of appeals, so that the two courts will not be stepping on each other's toes. There are exceptions, however, for situations in which the danger of such a collision is remote .... Since the right to appeal conferred by section 3731 is pinpointed on particular evidentiary rulings, there will be many cases in which the taking of the appeal will not require the district court to relinquish jurisdiction; that court will be able to continue getting the case ready for trial.

*United States v. Ienco,* 126 F.3d 1016, 1018 (7th Cir.1997) (citations omitted). The court realizes that proceeding in a case that has been dismissed in its entirety is different from proceeding in a case where part of a suppression motion has been granted. However, the government's appeal of this issue, if allowed to bring this unusually large and complex case to a screeching halt, would have a "disruptive effect on the criminal trial process," and thus the court is "obliged to balance the government's right to appeal pretrial orders with the defendants' right to proceed." *United States v. Andrews,* 764 F.Supp. 1252, 1258 (N.D.Ill.1991) (citing *United States v. Gatto,* 763 F.2d 1040, 1050 (9th Cir.1985)).

### D. The "Bugged" Lamp, Recommendation and Order at 41–57

■ O'Neill objects to the magistrate's recommendation that this court deny his motion to suppress the information that the government obtained by placing a listening device in the O'Neill residence. Recommendation and Order at 50. O'Neill argues that the government violated the provisions of Title III when it introduced the lamp containing the listening device into the O'Neill residence before obtaining a Title III order authorizing such placement. O'Neill's Second Objections at 2–10; Defendant O'Neill's Objections to Magistrate's Recommendation and Order (hereinafter "O'Neill's Objections") at 1–6.

The court agrees with the magistrate that the Supreme Court's decision in *United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), offers appropriate guidance in deciding the legitimacy of the government's actions. In *Karo*, the defendant contacted an undercover government informant and ordered 50 gallons of ether which he intended to use to extract cocaine from clothing imported into the United States. 468 U.S. at 708, 104 S.Ct. 3296. With the informant's consent, government agents placed an electronic homing device (a "beeper") into one of the ten cans of ether. *Id.* at 708–709, 104 S.Ct. 3296. Using the signal from the homing device, the government traced the movements of the ether cans to several storage lockers and then to a house rented by the defendants. *Id.* at 709–10, 104 S.Ct. 3296. Using some of the information obtained from the beeper, the government then applied for and received a warrant to search the rented house. *Id.* The search revealed the ten cans of ether, laboratory equipment, and cocaine. *Id.*

The Supreme Court first examined the government's actions in placing the beeper device in one of the cans of ether. The Court held that because the beeper was placed in the ether can with the consent of the government's informant, that placement did not infringe on the defendant's privacy interest. *Id.* at 712, 104 S.Ct. 3296. The Supreme Court reasoned that:

The mere transfer to Karo of a can containing an unmonitored beeper infringed no privacy interest. It conveyed no information that Karo wished to keep private, for it conveyed no information at all. To be sure, it created a potential for an invasion of privacy, but we have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment.

*Karo*, 468 U.S. at 712, 104 S.Ct. 3296. The Supreme Court also determined that the presence of the beeper within the can of ether did not constitute a seizure within the meaning of the Fourth Amendment: "Although the can may have contained an unknown and unwanted foreign object, it cannot be said that anyone's possessory interest was interfered with in a meaningful way. At most, there was a technical trespass on the space occupied by the beeper." *Id.* Therefore, the Court concluded that the government's clandestine placement of the beeper into the ether can did not infringe upon defendant's Fourth Amendment rights. *Id.* at 713, 104 S.Ct. 3296.

On the other hand, the Supreme Court also has determined that certain uses of electronic signals emanating from a beeper may violate a suspect's Fourth Amendment rights. In *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), the Court ruled that the government legitimately monitored an electronic beeper without invading the defendant's Fourth Amendment rights because the object containing the beeper remained within public eyesight. *Knotts*, 460 U.S. at 283–84, 103 S.Ct. 1081. However, the Court limited this ruling by determining that the monitoring remained legitimate only as long as the beeper stayed in an area subject to normal police observation, because the government in effect would be using the beeper to augment information which already was available to their normal senses. *Id.* at 283, 103 S.Ct. 1081. The *Knotts* Court reasoned that:

Visual surveillance from public places along [the codefendant]'s route ... would have sufficed to reveal all of these facts to the police. The fact that officers in this case relied not only on visual surveillance,

but on the use of the beeper to signal the presence of Petschen's automobile to the police receiver, does not alter the situation. Nothing in the Fourth Amendment prohibited the police from augmenting their the sensory faculties bestowed upon them at birth with such enhancement as science and technology have afforded them in this case.

*Knotts,* 460 U.S. at 282, 103 S.Ct. 1081. Therefore, because the defendant in *Knotts* placed the bugged container outside of his residence, in a location visible to people viewing the house from the outside, the police did not violate the defendant's Fourth Amendment rights when they monitored the electronic signal coming from the container. *Id.* at 285, 103 S.Ct. 1081.

In the instant case, the government did not violate O'Neill's Fourth Amendment rights by placing the inactive listening device in the lamp. The government placed the device in the lamp with the consent of Patricia Wolf. Government's Response at 5. As with the containers discussed in *Knotts,* the government did not use the listening device to confirm that the lamp entered the O'Neill residence. Therefore, the court agrees with the magistrate's conclusion that the government did not violate the Fourth Amendment in placing the listening device in the lamp. Recommendation and Order at 48–49.

■ The court also agrees with Magistrate Callahan's conclusion that the government violated O'Neill's right to privacy when it began monitoring the microwave transmissions from the listening device without first obtaining a Title III order. *Id.* However, the court does not find any indication that the government actually recorded any conversations which took place before it obtained the Title III order from Judge Terence T. Evans.[6] Therefore, the government's pre-warrant monitoring of the listening device only supplied the government with one piece of information: the fact that the lamp had been

plugged in. The court agrees with Magistrate Callahan's finding that the government's knowledge that the lamp had been plugged in did not play even the smallest role in Judge Evans's decision to grant the Title III order. Recommendation and Order at 47.

■ Furthermore, when Judge Evans issued the Title III order, he authorized the government to engage in any surreptitious entries that it needed to make in order to install the listening device. This is not to say that the ends justified the means: the government should not have monitored the microwave transmissions before obtaining the Title III order. However, even when the court strips the government of the limited benefits that it obtained from the premature monitoring, the government still had sufficient evidence with which to obtain the Title III order. Therefore, O'Neill has failed to meet his heavy burden under *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and the court will adopt Magistrate Callahan's recommendation to deny the motion to suppress the evidence obtained through the listening device installed in the lamp. Recommendation and Order at 50.

## II. Johnson F. Blake's Objections, Recommendation and Order at 58–69

■ Johnson Blake objects to the magistrate's recommendation to deny his motion to suppress evidence obtained during a search of his car and residence. Recommendation and Order at 58–69; Defendant Johnson F. Blake's Objections to Magistrate's Recommendation on Motion to Suppress under *Franks v. Delaware* (hereinafter "Blake's Objections") at 1. Blake also objects to the magistrate's denial of his request for a hearing pursuant to *Franks,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667. Under *Franks,*

**6.** Although Attorney William Marquis, counsel for Kevin O'Neill, argues that he can prove that the government intercepted conversations which took place before the government obtained a Title III order, he has given the court no indication of how he might do so. Instead, counsel resorts to making derogatory and sarcastic comments regarding the magistrate's recommendation and order. In the future, counsel would be well advised to use law and facts in order to advance his client's cause. In any event, the court agrees with the magistrate that an evidentiary hearing on this issue will not be necessary. Recommendation and Order at 46.

the defendant must show that the government engaged in "deliberate falsehood or reckless disregard for the truth" in obtaining the contested search warrant. *Id.* at 171, 98 S.Ct. 2674. Furthermore, this court must give the judge who issued the warrant, Magistrate Judge Stephen L. Crocker, great deference in reviewing his determination of probable cause. *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (citing *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)). Blake maintains that in obtaining the search warrant, the government purposely omitted facts which, if revealed, would have undermined the issuing judge's probable cause determinations. Blake divides the alleged omissions into three categories which Magistrate Callahan evaluated individually in his recommendation to this court.

## A. Special Agent DeValkenaere's Alleged Criminal Acts, Recommendation and Order at 61–62

■ First, Blake contends that ATF Special Agent Jeffrey Boobar failed to disclose that ATF Special Agent Sandra DeValkenaere's reliability was "tainted" because of her participation in illegal acts. Blake's Objections at 2. Blake contends that Agent DeValkenaere acted illegally when she participated in the placement of a listening device into a lamp which she knew might eventually end up in Kevin O'Neill's house. *Id.* at 2.

As this court has already determined, Agent DeValkenaere did not act illegally in placing the listening device in the lamp. Furthermore, Blake does not offer any substantial authority to contradict the magistrate's determinations with regard to the bugged lamp. Agent DeValkenaere did not intentionally violate federal law, and the court agrees with Magistrate Callahan that Agent Boobar did not have a duty to tell the magistrate that Agent DeValkenaere engaged in criminal acts. Such a statement would not have been true.

■ Blake also argues that the magistrate's recommendation adopts an "ends justifies the means" approach in evaluating Blake's motions to suppress. Blake's Objections at 4. The court agrees that judges should not employ an "ends justifies the means" analysis in deciding such motions. However, the court cannot find any indication that Magistrate Callahan engaged in this type of analysis, nor does Blake offer any explanation as to where or how this type of analysis occurred. *Id.* Absent a defendant's specific showing of error, the court may adopt, and in this case will adopt, the magistrate's position in full. *See United States v. Molinaro*, 683 F.Supp. at 211; 28 U.S.C. § 636(b)(1).

## B. The Reliability of David Wolf, Recommendation and Order at 63–67

■ Second, Blake argues that Agent Boobar failed to tell Magistrate Crocker, the magistrate who issued the Blake search warrant, that David Wolf, a cooperating witness, did not have firsthand knowledge about the information which Agent Boobar presented in his affidavit in support of the search warrant. In considering an application for a search warrant, a magistrate may rely on hearsay. Fed.R.Crim.P. 41(c)(1). Furthermore, a court may base its finding of probable cause on hearsay from confidential informants. *United States v. Taylor*, 931 F.Supp. 1447, 1459 (N.D.Ind.1996) (citing *United States v. Daccarett*, 6 F.3d 37, 56 (2nd Cir. 1993)) *aff'd*, 154 F.3d 675 (7th Cir.1998). Thus, "[e]ven if the bulk of the warrant affidavit was based on hearsay evidence conveyed by a confidential informant, such evidence alone will not flaw the affidavit." 931 F.Supp. at 1459 (citing *United States v. Carmichael*, 489 F.2d 983, 986 (7th Cir.1973)).

In deciding Blake's motion to suppress, this court needs to evaluate whether Agent Boobar's affidavit contained sufficient indicia of reliability to justify Magistrate Crocker's reliance on that document. Magistrate Callahan found that Magistrate Crocker relied on Wolf's testimony because Wolf also incriminated himself in his statements. Wolf's admission against his penal interest falls under a recognized and long-standing indicia of reliability. *See* Fed.R.Evid. 804(b)(3).

Although Blake argues the merits of the evidence showing that Blake either was or was not present for the J & R Watering Hole

incident, the court agrees with Magistrate Callahan's finding that "[i]n any event, whether or not Blake was present at J & R's watering hole is of little consequence. The warrant sought from Magistrate Crocker was not for Blake's arrest for the J & R Watering hole incident or, for that matter, any other incident." Recommendation and Order at 66. The defendant has not met his burden for invalidating the warrant, and the court will not alter the magistrate's recommendation and order as to this issue.

**C. The Reliability of Mark Quinn, Recommendation and Order at 67-68**

█ Third, Blake questions the reliability of the information provided by confidential informant Mark Quinn. As with the first two objections, Blake largely reiterates the arguments that he submitted to the magistrate. Blake contends that Agent Boobar's affidavit failed to disclose that Agent DeValkenaere found Mark Quinn to be untruthful and evasive. Blake also argues that Agent Boobar should have told Magistrate Crocker that Agent DeValkenaere did not prepare a report for February 14, 1996, a date on which Agent DeValkenaere claims Mark Quinn gave her important information. With regard to the February 14, 1996 report, Magistrate Callahan found that "[e]ven if [Magistrate] Crocker had been advised that there was no such report of an interview, such a fact would not in and of itself have fatally undermined a finding of probable cause." Recommendation and Order at 68. The court agrees with the magistrate that there are many possible explanations for why the report was not filed on the appointed day, and that absent any showing of intentional omission or foul play, the court cannot dispute Magistrate Crocker's probable cause determination in issuing the warrant.

With regard to Agent DeValkenaere's prediction that Mark Quinn might not prove a reliable informant, the magistrate found that the issuing court relied upon Agent Boobar's assurance that Quinn had provided reliable information on approximately 35 prior occasions before he told Agent Boobar about the scheduled February 15, 1996 meeting. The court finds that Magistrate Crocker had a sound basis for accepting Quinn's statements

and making the determination of probable cause.

Although Blake contests several portions of the evidence contained in the Boobar affidavit, the court finds that none of the contentions rise to the level of showing that the government presented the affidavit "in deliberate falsehood or reckless disregard for the truth." *Franks*, 438 U.S. at 171, 98 S.Ct. 2674. The court agrees with Magistrate Callahan that many of Blake's contentions do not affect the validity of the search warrant. Magistrate Crocker had more than enough information before him in order to establish the probable cause required for issuance of the search warrant. Thus, the court will adopt Magistrate Callahan's recommendations in full on this issue.

**III. Defendant Miller's Motion to Dismiss, Recommendation and Order at 75-80**

Defendant Randall E. Miller objects to the magistrate's recommendation that his motions to dismiss and suppress be denied. The magistrate recommended denial of these motions because Miller failed "to identify any particular statements he may have made or any particular items of physical or documentary evidence which he claims were seized as a result of a particular unlawful search or surveillance." Recommendation and Order at 79. The magistrate concluded that Miller "provide[d] insufficient information for this court to entertain his arguments and afford him any relief." *Id.* at 80.

Miller's objection does not cure this problem. Miller merely states that he objects to the recommendation "to preserve this issue" and that he "reserves the right to continue to argue these issues." *Objections of Defendant Randall E. Miller to Magistrate's Recommendation and Order of June 3, 1998 at 3.* Miller explains that he is unable to more clearly identify the evidence he wants suppressed because of time constraints, massive discovery, and government evasiveness. *Id.* at 2. While this may be unfortunate, it certainly does not give this court a reason not to adopt the magistrate's recommendation on this point. Therefore, the court will deny defendant Miller's motion to dismiss, motion

to suppress, and motion to suppress statements.

### IV. Morgan's Motion to Suppress, Recommendation and Order at 81–94 and 147

Defendant Raymond Morgan objects to the magistrate's recommendation that this court deny part of his "Motion to Suppress Evidence Seized as a Result of the March 8, 1995, Arrest, Search and Seizure in [sic] Evidence in Gary, Indiana." The magistrate recommended partial denial of this motion because probable cause supported the issuance of the warrant; however, the magistrate also recommended granting the motion to the extent the search violated the Fourth Amendment prohibition against general searches.

■■■ Morgan first argues that the fact that a suspect in the murder of Jack Castle, Alan Smick, was seen fleeing into the Outlaws clubhouse in Gary, Indiana, and the fact that the vehicle seen at the murder scene was parked behind the clubhouse (both of which occurred on the day before the search warrant was executed) did not provide probable cause to support a search of those premises. Morgan argues that since the clubhouse was not Smick's residence or maildrop, law enforcement officials could not have reasonably assumed that Smick or (what was presumably) his car could be found there the day after he was seen fleeing into the clubhouse. In support of this argument, Morgan cites two cases, *United States v. Brown,* 832 F.2d 991 (7th Cir.1987), and *United States v. Huguez–Ibarra,* 954 F.2d 546 (9th Cir.1992).

Neither case helps Morgan. In *Brown,* the court did not analyze the agreed-upon fact that the search warrant in that case was not supported by probable cause but merely stated as an *example* that the affidavits used to apply for the search warrant did not specify how police knew the premises to be searched were inhabited by the defendant. 832 F.2d at 994. *Brown* did not establish a categorical rule that all search warrants of premises other than a suspect's are invalid, even when the suspect is seen fleeing into the premises. In *Huguez–Ibarra,* the court found that there was no probable cause to search premises where the evidence offered

in support of the warrant application consisted merely of (1) observation of automobiles at the premises that allegedly belonged to "affiliates" or "facilitators" of drug trafficking; and (2) a canine sniff of suitcases belonging to people leaving the house that did not turn out to contain any drugs. 954 F.2d at 551. In contrast, the law enforcement officials in this case observed the murder suspect and his car present at the premises to be searched, a much stronger showing of probable cause.

Furthermore, the court believes that seeing the murder suspect flee into his gang's clubhouse and seeing the car that was present at the murder scene parked behind the clubhouse provided probable cause to support the warrant. Morgan would have this court hold that seeing a fleeing suspect run into a house actually destroys probable cause because a court must presume that a suspect would then flee out of and away from the house. Such a holding would turn probable cause on its head and would encourage suspects to flee in the hope that a court would not issue a search warrant because of a presumption that a suspect will continue to flee, an untenable result. Therefore, the court will adopt the magistrate's recommendation on this point.

■■■ Morgan next argues that although the magistrate correctly found that the search warrant was general and was therefore prohibited, the magistrate's application of the severance doctrine was not the correct legal remedy. Although the U.S. Supreme Court and the Seventh Circuit have not ruled on this issue, the magistrate noted that a majority of federal circuits have adopted the severance doctrine. *See* Recommendation and Order at 88–89. Morgan does not cite any authority to support his argument that severance is not a proper remedy. Therefore, the court will adopt the magistrate's recommendation on this point.

■■■ Finally, Morgan objects that the seizure of documents containing names and addresses of Outlaw members and clubhouses was improper because there is an "insufficient nexus" between the Castle murder and this evidence. This court disagrees and

holds that there was a sufficient nexus between the two. For example, two men who witnessed part of the Castle murder told the investigating officer that Castle was a member of Hell's Angels and feared that he was going to be murdered by members of the Outlaws, the rival motorcycle gang that had been involved in a gang war with Hell's Angels since June 1994. Recommendation and Order at 82–83. Under these circumstances, membership in the Outlaws was relevant to the Castle murder, and thus the search warrant authorizing the seizure of indicia of gang membership was valid.

## V. Kruppstadt's Motion to Suppress, Recommendation and Order at 96–97, 186, 193

Defendant Richard Kruppstadt first objects to the magistrate's recommendation to partially deny Kruppstadt's motion to suppress evidence seized as a result of the search of his residence at 1228 Hayes Avenue, Racine, Wisconsin. The magistrate granted Kruppstadt's motion regarding photographs of motorcycles and of Kruppstadt unclothed, but denied the motion as to all other items seized. Recommendation and Order at 96–97.

Kruppstadt first objects that the firearms seized were not within the scope of the warrant and were not properly seized under the plain view exception, thereby requiring suppression of those items. Kruppstadt argues that the firearms were not in plain view but were in a locked safe (and one firearm was also stored in a locked, opaque canvas bag). However, the officers were lawfully searching for any items relating to the Outlaws Motorcycle Club, and as long as those items could possibly fit in the safe or the opaque bag, a fact which this court has no difficulty finding, then the officers could lawfully enter those containers. *See, e.g., United States v. Reed,* 726 F.2d 339, 342 (7th Cir.1984). Therefore, the court rejects this objection.

Kruppstadt further argues for the suppression of several items that he alleges are not illegal to possess and do not bear any relationship to the Outlaws: a can of Mace, various photographs, a microwave detector, two mortgage payment books, one checkbook, a beret, "additional photos," business cards, and a car rental receipt. Defendant Kruppstadt's Objections to Magistrate's Recommendation and Order Dated June 3, 1998 Regarding Motion to Suppress and Indicia Search Warrants (hereinafter "Kruppstadt's Objections") at 5.

Regarding the Mace, the government notes that although citizens may possess pepper spray, they may not possess Mace (Kruppstadt apparently does not dispute this, as he did not respond to this statement by the government). Furthermore, Kruppstadt was convicted in April 1995 for possession of a similar unlawful substance. Because the incriminating nature of such evidence was therefore immediately apparent to the government agents searching Kruppstadt's residence, the court will not suppress this item.

Regarding the photographs, the magistrate properly recommended the suppression of photographs of motorcycles and of naked people, and the government has indicated that it has no plans to introduce these photographs. However, those photographs that show Outlaws members with Outlaws tattoos and Outlaw paraphernalia are relevant and were properly seized under the terms of the search warrant. Therefore, the court rejects Kruppstadt's objection to the admission of those photographs.

Regarding the microwave detector, the government intends to prove at trial that Kruppstadt and O'Neill used the device to find microphones placed within O'Neill's residence; therefore, this evidence may well be incriminating, and the court thus rejects Kruppstadt's objection on this point. Regarding the mortgage payment books, the checkbook, the business cards, and the car rental receipt, the government states that it intends to use this evidence to prove that Kruppstadt was a resident of the premises searched, to prove Kruppstadt's use of the alias "Clay" and "Clay Allison," and to prove involvement in surveillance and violence directed at Hell's Angels members in La-Crosse, Wisconsin. Therefore, Kruppstadt's assertion that this evidence is "not related to

the prosecution of this case" is incorrect, and the court rejects his objection. Finally, regarding the beret, the government intends to prove its association with the Outlaws, a contention to which Kruppstadt has not responded. Therefore, the court rejects this objection as well.

## VI. Mroch's Motion to Suppress, Recommendation and Order at 101, 104–107

### A. Search of Mroch's Residence, Recommendation and Order at 101

Defendant Richard Mroch objects to the magistrate's recommendation that this court deny his motion to suppress evidence seized as a result of a search of his residence located at 7332 West 59th Street, Summit, Illinois. The magistrate found that the search warrant was supported by probable cause because the police seized drugs in the possession of a woman, Melanie Crandall, who had just left Mroch's residence. The magistrate therefore recommended that the drugs, drug paraphernalia, United States currency, and proof of residency not be suppressed. *See* Recommendation and Order at 101.

■ Mroch first objects that an indictment and arrest warrant for Mroch do not supply probable cause to justify the search of his residence. Motion and Brief Challenging Magistrate Judge's Recommendation and Order Dated June 3, 1998 Regarding a Search Pursuant to a Warrant at Pages 97–107 (hereinafter "Mroch's Objections") at 5–6. However, probable cause to justify the search came from the seizure of drugs or drug paraphernalia that probably had just been in the Mroch residence, not from the indictment or arrest warrant for Mroch. Therefore, this objection is without merit.

Mroch then speculates that since Mroch's residence was a duplex, Crandall may have been entering a different part of the residence than Mroch's residence. Mroch's Ob-

jections at 6. He further speculates that since Crandall did not have the business cards that she allegedly picked up at Mroch's residence with her when she was pulled over, the police did not determine that "any relationship existed between Ms. Crandall and Mr. Mroch." *Id.* at 6–7. However, the magistrate specifically found that Crandall "arrived at Mroch's residence," "retrieved the business cards left by Brezette and entered the residence," and then "left the residence carrying a brown plastic bag." Recommendation and Order at 98–99. Mroch fails to cite any evidence or testimony to contradict this account; therefore, the court cannot agree with his objection.

■ Mroch then argues that the traffic stop of Crandall was a pretext, arguing that it "seems highly unlikely" that a Police Detective Lieutenant would ever stop a motor vehicle for a traffic violation. Mroch's Objections at 7. As the government correctly notes, this argument is utterly without merit: "The argument that ulterior motives invalidate a police stop for a traffic violation is a tired argument in this circuit, . . . and this country." *United States v. Williams,* 106 F.3d 1362, 1365 (7th Cir.1997) (quoting *United States v. Murray,* 89 F.3d 459, 461 (7th Cir.1996) (citing *United States v. Trigg,* 878 F.2d 1037 (7th Cir.1989), and *Whren v. United States,* 517 U.S. 806, 808–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996))). Therefore, the court will reject this objection.

■ Mroch then argues that the search warrant was invalid because the officer's affidavit in support did not indicate whether Crandall carried an item such as a purse into the residence and did not indicate whether the white residue on the drug paraphernalia was tested for the presence of cocaine. Given the substantial other evidence cited in the affidavit, such as the 50 grams of cocaine found with Crandall, the court does not believe that the absence of these facts renders the warrant invalid.[7]

---

7. In this same vein, Mroch argues that the investigating officer did not indicate in his affidavit how he knew that the food chopper was typically used for mixing controlled substances, and that "[i]n fact, Lt. Wasko testified that he had been a Lieutenant for only five years." Mroch's Objec-

tions at 7–8. Needless to say, one need not serve as a police officer, much less a lieutenant, for a lifetime to know that a chopper in a bowl containing a white residue, contained in a brown bag in someone's car, usually does not indicate innocent usage, e.g., that the possessor simply

Finally, Mroch argues that an affiant's sworn statements that the affiant believes that contraband will be found on a premises is not sufficient, citing *Nathanson v. United States,* 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933), and that an officer's statement that a credible person has stated that drugs are stored in a home is likewise inadequate, citing *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Mroch's Objections at 8–9. However, in neither of those cases did police actually seize contraband on its way out of the premises before applying for a warrant, as in this case. Therefore, these cases are distinguishable, and the court will adopt the magistrate's recommendation that this search warrant was supported by probable cause (other than the noted exception of the gang paraphernalia, *see* Recommendation and Order at 101).

### B. "Plain View Exception," Recommendation and Order at 104–107

Mroch objects to the magistrate's recommendation that the remaining seized items not be suppressed because they fall within the plain view exception. *See* Recommendation and Order at 104–107. Mroch argues that the federal agent used the police officer's affidavit "as a mere subterfuge to search Mr. Mroch's residence for evidence for the alleged Rico Conspiracy investigation in the Eastern District of Wisconsin." Mroch's Objections at 10.

However, as the government correctly notes, pretext is no more of a defense against the plain view doctrine than it is against a traffic stop:

> The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search [but yet does not include the item in the warrant] should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement.

*Horton v. California,* 496 U.S. 128, 138, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Therefore, the court rejects Mroch's "pretext" argument and will adopt the magis-

trate's recommendation that Mroch's motion to suppress be denied.

### VII. Meinen's Motion to Suppress Physical Evidence and Statements, Recommendation and Order at 107–119

James Meinen objects to Magistrate Callahan's recommendation that this court deny his motion to suppress statements and his motion to suppress physical evidence. Meinen's Objections to Magistrate Judge's Recommendation (hereinafter "Meinen's Objections") at 1–2. Meinen contends that the government violated his constitutional rights when federal agents searched his car for drugs and when they elicited statements from him during an interview after the search. *Id.*

As noted previously, the general statements that a party "objects" and "incorporates all arguments previously made to the magistrate" will not suffice. *Molinaro,* 683 F.Supp. at 211. This fundamental rule also applies to Meinen's objections. In this instance, instead of stating that the defendant "incorporates all arguments previously made to the magistrate," the defendant instead engaged a word processor to copy and paste together all of the arguments which he initially presented to the magistrate judge. The court finds this technique unpersuasive and needlessly repetitive. In order to rule upon the defendant's objections, the court will first have to wade through a sea of legal prose in order to winnow out the defendant's specific legal and factual objections.

The defendant maintains that the government did not have probable cause to search his car. He states that "[o]n the day in question, no one claimed to have seen the defendant obtain anything from the pharmacy clerk, much less the precise nature and identity of any theoretical object received." Meinen's Objections at 4. However, the magistrate found that in making the Meinen arrest, government agents relied upon their observations of the defendant that day, their observations of other defendants engaging in similar activities on previous occasions, their observations of the defendant engaging in a

likes to chop up his or her sugar before he or she eats it.

similar activity on a prior occasion, the corroborated evidence of a government informant, and potentially incriminating evidence obtained from K–Mart's security personnel. Recommendation and Order at 108–12, 116. The defendant did not object to any of the above facts as set forth by Magistrate Callahan.

■ The government agents had sufficient probable cause to arrest the defendant and to search his car. Probable cause exists if, under the totality of the circumstances, "including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Navarro,* 90 F.3d 1245, 1252 (7th Cir.1996). However, "[p]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates,* 462 U.S. at 243–44 n. 13, 103 S.Ct. 2317. The federal agents gathered more than enough evidence to provide them with probable cause for their arrest.

■ Meinen contends that the agents waited for an impermissible period of time before they decided to arrest him. Meinen's Objections at 4. He contends that the agents only waited because they wanted to search his car. *Id.* However, the facts indicate that the agents only waited the short period of time between when the defendant obtained the package from the pharmacy and when he entered his car. Recommendation and Order at 109–114. This time period could not have been more than one or two minutes, so the defendant faces an uphill battle in convincing the court that the government impermissibly delayed his arrest for the period of time that it took the defendant to walk from the store to his car in the parking lot. The defendant did not persuade the magistrate and fails to persuade this court that the government acted unreasonably. Thus, the court will not suppress evidence based upon the timing of Meinen's arrest.

■ Finally, Meinen argues that the government agents illegally obtained statements

from him without first informing him of his *Miranda* rights. Meinen's Objections at 5–6. However, Magistrate Callahan determined that Meinen was not in custody at the time that he gave the government the disputed statements, because the government had already informed him that he was free to leave. Recommendation and Order at 119. The magistrate reasoned that, although the government agents initially placed Meinen in custody when they handcuffed him and confined him to the back of a squad car, he was not in custody when he made the disputed statements. Because *Miranda* only applies to custodial interrogations, the government agents did not need to inform Meinen of his *Miranda* rights after they told him that he was free to go. *United States v. Vega,* 72 F.3d 507, 516 (7th Cir.1995). Meinen has not advanced any argument showing that he misunderstood or disbelieved the government agents when they told him that he was free to go. The court will adopt Magistrate Callahan's recommendations in full on this issue.

## VIII. Blake's and O'Neill's Motion to Suppress Fox Lake Evidence, Recommendation and Order at 120–135

Defendants Johnson Blake and Kevin O'Neill object to Magistrate Callahan's recommendation that the court deny their motion to suppress evidence obtained in a February 10, 1994 search of Blake's van and to suppress statements which Blake made to law enforcement authorities subsequent to his arrest. O'Neill's Objections; Defendants Johnson F. Blake's and Kevin P. O'Neill's Objections to Magistrate's Recommendation to Suppress Stemming From Fox Lake, Illinois, Arrest (hereinafter "Blake's Objections"); Recommendation and Order at 120. Although defendant O'Neill filed objections to this portion of the recommendation, the court cannot find any reasonable nexus between O'Neill's Fourth or Fifth Amendment rights and the Fox Lake searches. O'Neill did not own the van which Officer Bostic searched. At best, O'Neill might object to the pat-down search of his body. However, the search did not reveal any contraband, and the search did not result in the Fox Lake authorities bringing any charges against him. Additionally, O'Neill did not give the police

any statements during or after the detention and subsequent arrest. Therefore, the court is left to evaluate the objections as they relate to Johnson Blake.

In evaluating these objections, the court reviewed the entire transcript of Magistrate Callahan's March 19, 1998 suppression hearing. The court finds that Magistrate Callahan made appropriate determinations as to the facts surrounding the Fox Lake incident and therefore adopts the factual background as presented in pages 120–126 of the recommendation. Although Blake points out that Officer Bostic provided a more detailed account of the incident to the court than he did in his original police report, the court finds no reason to discredit his testimony. During the hearing, Officer Bostic stated that he prepared his report as a device to refresh his memory in giving testimony and in keeping the facts of the arrest separate from those of other arrests. April 3, 1998 Transcript at 99, 107. Therefore, the court finds that Officer Bostic's omissions may have occurred as an oversight or perhaps out of his carelessness in preparing the report. In evaluating Blake's objections, the court will view Officer Bostic's testimony as substantially correct.

The court agrees with the magistrate that Blake's objections present the court with two questions to decide. First, the court must determine if Officer Bostic violated Blake's Fourth Amendment rights when he searched him for weapons, placed him in a locked squad car, and then searched the interior of Blake's van. Second, the court must determine if Officer Bostic advised Blake of his *Miranda* rights prior to Blake's admission that the gun found in the van was his. Recommendation and Order at 127.

█ As to the first question, Blake contends that Officer Bostic did not have sufficient reason to detain him in the back of the police squad car nor to conduct the search of his van. Blake bases his objections on the Supreme Court's decision in *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). *Royer* states that "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible. The reasonableness requirement of the Fourth Amendment re-

quires no less when the police action is a seizure permitted on less than probable cause because of legitimate law enforcement interests." *Royer,* 460 U.S. at 500, 103 S.Ct. 1319 (citations omitted). Although Blake strives to analogize the facts of his case to *Royer*'s facts, the facts of the cases remain dissimilar. In *Royer,* police officers escorted an air traveler suspected of drug smuggling to an airport interrogation room in order to ask him for permission to search his luggage. *Id.* at 492–95, 103 S.Ct. 1319. The Supreme Court reasoned that the police officers could have used drug testing dogs as a less invasive means to test for the presence of drugs in the defendant's luggage. *Id.* at 505, 103 S.Ct. 1319. The Supreme Court also found that the police officers subjected the defendant to a more restrictive level of detention than called for by the evidence available to them at the time: "What had begun as a consensual inquiry in public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions." *Id.* at 503, 103 S.Ct. 1319.

However, two years later, the Supreme Court limited its *Royer* requirement by admonishing courts not to second guess the legitimate law enforcement techniques used by the police. In *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), the Supreme Court ruled that courts making a reasonableness of detention determination "should take care and consider whether the police are acting in a swiftly developing situation, and in such cases the court should not engage in unrealistic second guessing." *Id.* at 686, 105 S.Ct. 1568. The Court warned that

[a] creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by "less intrusive" means does not, in itself, render the search unreasonable.

*Id.* at 687, 105 S.Ct. 1568 (citing *Cady v. Dombrowski,* 413 U.S. 433, 447, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973)).

Throughout the past decade, federal courts have developed a more flexible approach to evaluating the reasonable use of police procedures in conducting *Terry* stops.[8] The Seventh Circuit recently described this "trend towards greater latitude," stating that:

> In the recent past, the permissible reasons for a stop and search and the permissible scope of the intrusion under the *Terry* doctrine have expanded beyond their original contours. The last decade has witnessed a multifaceted expansion of *Terry,* including the trend granting officers greater latitude in using force in order to neutralize potentially dangerous suspects during an investigatory detention. For better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention.

*United States v. Tilmon,* 19 F.3d 1221, 1224 (7th Cir.1994) (citations omitted).[9] In applying this more permissive view of the Fourth Amendment with regard to *Terry* investigatory stops to the facts of this case, the court agrees with Magistrate Callahan that *Tilmon* proves instructive.

Officer Bostic acted within the confines of the Fourth Amendment when he patted down and then confined the defendants in the back seat of his cruiser. The police department dispatched Officer Bostic to the scene to respond to a reported fight in progress. When he arrived on the scene, he observed two men (O'Neill and Miller) standing in front of a third man (Murphy) who appeared to be cornered and to have capitulated.[10] After Officer Bostic patted down O'Neill and Miller, he discovered more than adequate

evidence to justify his decision to place the defendants in the police cruiser. Although simply possessing wrenches, Mace, and folding knives might not necessarily violate Illinois law, the presence of those items legitimately indicates that the men carrying them may not have been simply "talking" as they claimed.[11] Likewise, Officer Bostic appropriately used a show of force to compel Blake's compliance with his demands. Officer Bostic could not see Blake's body, and he did not know if Blake had ready access to a loaded gun or some other deadly weapon.

██ Finally, Officer Bostic appropriately entered Blake's van in order to investigate the gun case laying behind the driver's seat in the van. Possessing a firearm while in a vehicle is a crime in Illinois. *See* 720 Ill. Comp. Stat. Ann. 5/24–1(a)(4). Given the preceding circumstances of Officer Bostic's investigation in combination with his discovery of Mace, baseball bats, and handcuffs on the floor of the van, Officer Bostic had more than enough evidence to justify his entry into the van to investigate. Recommendation and Order at 124. Also, as the magistrate found, Officer Bostic's looking into the van did not constitute a search, because the van door was open so that any passerby could have looked into the van and observed its contents. Recommendation and Order at 132. Therefore, under this court's reading of *Tilmon* and *Royer,* Officer Bostic's actions do not present a close call. The court will adopt Magistrate Callahan's recommendation to deny the motion to suppress.

As to the Fox Lake Police Department's inability to produce a *Miranda* waiver form for Johnson Blake, the court will defer to Magistrate Callahan's determinations as to witness credibility. The question of Blake's admission that he owned the Smith and Wesson model 3904 nine millimeter handgun

---

**8.** *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**9.** The court notes that Magistrate Callahan included this same passage in his recommendation and order on page 128.

**10.** Officer Bostic reported that when he arrived on the scene, Murphy had his back against the van and had his arms outstretched, with his

palms facing up. Bostic further testified that O'Neill and Miller were standing in front of Murphy so as to prevent him from stepping away from the van. Recommendation and Order at 121; April 3, 1998 Transcript at 109–110.

**11.** The court notes that under Illinois law, citizens may not carry some forms of Mace. 720 Ill. Comp. Stat. Ann. 5/24–1(a)(3) (West 1998).

comes down to one of credibility. Officer Bostic testified that he presented the *Miranda* warnings to Blake and that Blake signed the form. Blake contends that he never received his *Miranda* warnings and that his admission is thus inadmissable. Blake's Objections at 17–18. After hearing the evidence, Magistrate Callahan determined that "[i]n my view, Bostic's word is good on the issue. I am persuaded that Blake was advised of his *Miranda* rights prior to admitting that he owned the nine millimeter pistol." Recommendation and Order at 135.

After reviewing the transcripts of the April 3, 1998 hearing, the court finds no reason to question Magistrate Callahan's determinations. If after a careful review of the record a "district court is satisfied with the magistrate judge's findings and recommendations it may in its discretion treat those findings and recommendations as its own." *Goffman v. Gross,* 59 F.3d 668, 671 (7th Cir.1995) (citing *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). Thus, "[t]he district court is not required to conduct another hearing to review the magistrate judge's finding or credibility determinations." *Id.* (citing *Raddatz,* 447 U.S. at 676, 100 S.Ct. 2406). The court will adopt Magistrate Callahan's determination that Blake was made aware of his *Miranda* rights, while at the same time echoing the magistrate's admonition that the Fox Lake Police department quickly resolve this "most disturbing" set of circumstances. Recommendation and Order at 135. Accordingly, Blake's motion to suppress will be denied.

## IX. Morgan's Motion to Suppress, Recommendation and Order at 134–47

Morgan objects to the magistrate's recommendation that this court deny his "Motion to Suppress Any Evidence Seized as a Result of September 3, 1994 Automobile Stop and Search." The magistrate found that the law enforcement officer made a reasonable *Terry* stop of the car Morgan was traveling in after the officer observed the car, full of Outlaws, drive slowly past their rivals' (the Sons of Silence) clubhouse at least the second time that day.

Morgan first argues that the stop was not reasonable because of the existence of a "few facts" worth noting, or rather, absence of facts—i.e., that the officer did not have a search warrant, that he did not observe the Outlaws commit any traffic violations, that he hadn't received a dispatch or tip that the Outlaws were engaging in any illegal activity, and that the officer did not observe the Outlaws raising their firearms. Objections to the Magistrate's Recommendation as to Defendant's Motion to Suppress Evidence (hereinafter "Morgan's Objections") at 2. However, none of these are required before an officer may make a *Terry* stop, e.g., he need not wait until guns are raised and bullets are flying to intervene.

Morgan further argues that a suspicious vehicle slowly driving past a building is not adequate to justify a *Terry* stop. *See United States v. Posey,* 663 F.2d 37 (7th Cir.1981). The magistrate distinguished *Posey* because of the presence of additional facts creating reasonable suspicion in the present case that were lacking in *Posey* : the officer here knew that the Outlaws and the Sons of Silence were engaged in a gang war; he knew that a member of the Outlaws had been shot recently; he knew that a member of the Hell's Henchmen, a group associated with the Sons of Silence, had been shot recently; and he had reason to believe that the Outlaws had driven past their rivals' clubhouse several times that day.

The court agrees that *Posey* is distinguishable on its facts. The court also finds that *Posey* is further distinguishable because the *Posey* court did not explicitly hold that driving slowly past a place does not justify a *Terry* stop, but instead assumed that it did justify a stop but that the justification evaporated by the time the officer stopped the vehicle: "Even assuming arguendo that Posey's conduct in Steele constituted justification for a Terry stop, that justification had evaporated by the time of the stop." *Posey,* 663 F.2d at 41. Not only did the officer in this case make a much quicker stop than in *Posey,* but the whole "evaporation" doctrine has since been called into "considerable doubt" by the Seventh Circuit. *United*

*States v. Feliciano,* 45 F.3d 1070, 1074 (7th Cir.1995). Therefore, the court holds that the officer formed an articulable and objectively reasonable suspicion that the Outlaws were potentially dangerous, and the court will adopt the magistrate's recommendation on this point.

■ Finally, Morgan argues that the duration and extent of the *Terry* stop "converted this stop into an arrest without probable cause as well as a warrantless search and seizure without probable cause." Morgan's Objections at 3. The magistrate correctly stated that the search did not need to be justified by probable cause but instead was justified by the officer's reasonable suspicion that the Outlaws were potentially dangerous. Furthermore, as the magistrate noted, even approaching a suspect with guns drawn, asking the suspect to enter a police car and drive around with the police, and detaining him for over an hour has been considered to be a reasonable *Terry* stop and not an arrest. *Vega,* 72 F.3d at 515–16. Although the Seventh Circuit noted that such a stop may "approach the outer boundaries of a permissible Terry stop," *id.* at 515, the stop in this case was certainly within those outer boundaries, especially considering that the driver of the car called out to the approaching officer that the inhabitants of the car were armed. Therefore, the court will adopt the magistrate's recommendation and will deny Morgan's "Motion to Suppress Any Evidence Seized as a Result of September 3, 1994 Automobile Stop and Search."

## X. Motion to Suppress Evidence Obtained in Search of the Janesville Clubhouse, Recommendation and Order at 147–175

Defendants McVay, Kruppstadt, Meinen, Blake, O'Neill, Powers, and Hanson object to Magistrate Callahan's recommendation that this court deny their motion to suppress the evidence obtained in the June 10, 1997 search of the Outlaws' clubhouse located in Janesville, Wisconsin. Defendants' Objections to the Magistrate Judges's Report and Recommendation Regarding the Defendants' Motion to Suppress Evidence Seized From the Janesville Clubhouse (hereinafter "Defendants' Objections"); Recommendation and Order at 175.

■ In evaluating the government's search of the clubhouse, Magistrate Callahan first determined that the government did not have a valid justification to perform a protective sweep of the clubhouse subsequent to the arrest which took place on the front lawn of the clubhouse. Recommendation and Order at 167. The magistrate reasoned that pursuant to the Supreme Court's protective sweep doctrine as set forth in *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the arresting officers' protective sweep did not fall within the definition of a search which is "narrowly confined to a cursory visual inspection of those places in which a person might be .hiding." *Id.* at 327, 110 S.Ct. 1093. However, because the government has not objected to Magistrate Callahan's recommendation on that issue, the court will adopt that recommendation as a matter of course. *See Banta Corp.,* 915 F.Supp. at 81.

■ Magistrate Callahan then determined that Ronald Lundgren, one of the occupants of the Outlaws' Clubhouse at the time that it was searched, consented to the so-called protective sweep of the residence. Recommendation and Order at 170. The defendants object to this determination, arguing that Magistrate Callahan should have relied upon Lundgren's assertions that the arresting officers did not obtain his consent before proceeding with the protective sweep. In making his final determination, Magistrate Callahan relied upon ATF Special Agent David Balkema's testimony as to the events which transpired on the front lawn of the Outlaws' Clubhouse. March 24, 1998 Transcript at 182–240. Agent Balkema recalled that Lundgren consented to the search and that Lundgren's demeanor had been "agreeable" throughout the interaction. March 24, 1998 Transcript at 186. Magistrate Callahan and the defendants acknowledge that in the final analysis, the legality of the protective sweep hinges on whether or not Lundgren consented to the search. Recommendation and Order at 169; Defendant's Objections at 17–19. As the defendants acknowledge in their objections, the court does

not have to exercise its *de novo* discretion in reviewing the credibility determination made by the magistrate judge. *Raddatz*, 447 U.S. at 676, 100 S.Ct. 2406. Indeed, the court may give the magistrate's credibility determinations such weight "as their merit demands." *Id.* at 683, 100 S.Ct. 2406.

Magistrate Callahan made a difficult factual determination when he found that Lundgren consented to the search of the Outlaws' Clubhouse. The magistrate noted that various witnesses gave conflicting accounts of the events which transpired immediately before the federal agents conducted the protective sweep, finding that "[n]either Casey nor Lundgren are without flaws in their credibility." Recommendation and Order at 169. However, after weighing the testimony, the magistrate determined that Lundgren did consent to the government's protective sweep of the clubhouse. *Id.* at 170.

After reviewing the relevant portions of the hearings in this case, the court agrees with the magistrate. The court realizes that Lundgren and Casey offer different versions of the events which occurred outside of the clubhouse on the morning of the June 10, 1997. *See* March 18, 1998 Hearing Transcript at 11–62; March 24, 1998 Transcript at 138–173. Additionally, the court notes that both witnesses had personal and/or professional reasons to potentially color their testimony in an attempt to validate or invalidate the government's protective sweep. However, the court agrees with the magistrate that Agent Balkema's testimony proves the most credible.

After reviewing the record in this case, the court does not see any reason to set aside Magistrate Callahan's sound credibility determination. Taken as a whole, Agent Balkema's testimony seems more internally and externally consistent than does Lundgren's testimony. For example, both parties agree that Lundgren came out of his house, put away the guard dogs, and then opened the front gate in order to allow the police officers to arrest Allen McVay. These facts indicate that Lundgren adopted an "agreeable" demeanor throughout the arrest and protective sweep. If Lundgren were of a mind to contest the arrest and protective

sweep, he never would have opened his front door and restrained the dogs. Therefore, this court accepts Magistrate Callahan's considered credibility determination that when the police officers asked if they could conduct a protective sweep, Lundgen consented to the search.

 Finally, Magistrate Callahan determined that Magistrate Crocker had sufficient probable cause to issue the June 10, 1997 search warrant for the Outlaws' Clubhouse. The defendants object to Magistrate Callahan's refusal to invalidate Magistrate Crocker's search warrant, contending that Magistrate Crocker relied on illegally obtained evidence from the early morning protective sweep of the Outlaws' clubhouse and that Magistrate Crocker committed clear error by relying on tainted information as a basis for the search. Defendants' Objections at 19–20.

Initially, the court notes that Magistrate Callahan evaluated the defendants' objections using the correct standard of review. As the Supreme Court reaffirmed in its *Gates* decision, "a magistrate's determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (citing *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)). Therefore, "so long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Id.* (citing *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)).

A review of the information that Magistrate Crocker had before him when he made his probable cause determination shows that he had a substantial basis for concluding that a search of the Outlaws' Janesville Clubhouse would reveal evidence of wrongdoing. Magistrate Crocker relied upon an affidavit from a confidential informant who had been in the clubhouse and reported that the Outlaws kept important records at that location. Recommendation and Order at 172. The confidential informant also reported that the Outlaws' clubhouse contained many photographs and other indicia of Out-

law membership. *Id.* Therefore, the court agrees with the government that even without the corroborative evidence obtained from the voluntary protective sweep of the Outlaws' clubhouse, Magistrate Crocker had enough information to justify the issuance of the search warrant. *See* Government's Response at 12. Although the corroborative evidence bolstered the reliability of the confidential informant, the informant had already proved his reliability on more than 50 prior occasions. Recommendation and Order at 172. Especially when viewed in light of the deference that a reviewing court must give to a magistrate's probable cause determination, the court does not have any reason to invalidate the June 10, 1997 search warrant.

## XI. Objections to "Indicia Warrants," Recommendation and Order at 186 and 193

Kruppstadt further objects to the nature of the "indicia" search warrants, an objection which he says relates to the search of the 1228 Hayes Avenue premises (Recommendation and Order at 184–186) as well as to the search of the Outlaws' clubhouse at 1263 Cherry Street, Janesville, Wisconsin (Recommendation and Order at 193). The magistrate rejected this "indicia" argument, stating that although the affidavit supporting the warrant application may have failed to demonstrate probable cause pursuant to *United States v. Rubio,* 727 F.2d 786 (9th Cir.1983), the evidence seized pursuant to the "indicia" warrants should not be suppressed pursuant to the good faith rule of *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Recommendation and Order at 193.

Kruppstadt objects, taking the court through a long discussion of the *Rubio* case and of why the search warrants here were invalid pursuant to *Rubio.* Kruppstadt's Objections at 7–12. However, Kruppstadt fails to address *Leon* or the good faith exception anywhere in his objections. Therefore, the court will adopt the magistrate's recommendation on this point and will deny the motions to suppress to the extent that they are based on the "indicia" argument.

## XII. CONCLUSION

Accordingly,

**IT IS ORDERED** that O'Neill's "Omnibus Motion to Suppress Evidence Intercepted or Gathered Under Title III" (Docket No. 355) be and the same is hereby **DENIED** in part and **GRANTED** in part;

**IT IS FURTHER ORDERED** that Blake's "Motion to Suppress Evidence Under *Franks v. Delaware*" (Docket No. 367) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Powers' "Motion to Suppress Evidence Obtained through March 12, 1995, Warrantless Stop and Search of Automobile" (Docket No. 389) be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that Miller's "Motion to Dismiss Indictment and/or Suppress Evidence Due to Outrageous Government Conduct" (Docket No. 372) be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that Miller's "Motion to Suppress Physical Evidence and Fruits of Unlawful Searches, Surveillances and Seizures" (Docket No. 373) be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that Miller's "Motion to Suppress Statements" (Docket No. 374) be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that Morgan's "Motion to Suppress Evidence Seized as a Result of the March 8, 1995, Arrest, Search and Seizure in Evidence in Gary, Indiana" (Docket No. 360) be and the same is hereby **GRANTED** in part and **DENIED** in part;

**IT IS FURTHER ORDERED** that Kruppstadt's "Motion to Suppress Evidence Seized as a Result of the Search of 1228 Hayes Avenue, Racine, Wisconsin" (Docket No. 363) be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that Mroch's "Motion Challenging a Search Pursuant to a Warrant of 7332 W. 59th Street, Summit, Illinois" (Docket No. 346) be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that Meinen's "Motion to Suppress Physical Evidence" (Docket No. 350) be and same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that Meinen's "Motion to Suppress Statements" (Docket No. 349) be and same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that Blake's and O'Neill's "Motion to Suppress Under *Draper v. United States* and *Miranda v. Arizona* Any and All Oral, Written, Adopted or Recorded Statements and/or any Evidence Seized from [their respective] Persons and/or Vehicles by the Village of Fox Lake, Illinois, Police Department on February 10, 1994" (Docket No. 366) be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that Morgan's "Motion to Suppress Evidence Seized as a Result of Illegal Stop of Automobile, Arrest and Search on September 3, 1994" (Docket No. 358) be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that McVay's, Kruppstadt's, Meinen's, Blake's, O'Neill's, and Power's "Motion to Suppress Physical Evidence Seized on June 10, 1997, at 1263 Cherry Street, Janesville, Wisconsin" (Docket No. 370) be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that Kruppstadt's, McVay's, Meinen's, Hanson's, O'Neill's, Power's and Blake's "Motion to Suppress Physical Evidence Seized on June 10, 1997, at 1263 Cherry Street, Janesville, Wisconsin" (Docket No. 363) be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that defendants' motions to adopt each others' Round II objections be and the same are hereby **GRANTED;**

**IT IS FURTHER ORDERED** that pursuant to the court's determination that the government did not timely seek subsequent authorizations for Title III surveillance regarding crimes not listed in the original authorizations, all counts of the indictment be and the same are hereby **DISMISSED;**

**IT IS FURTHER ORDERED** that the defendants detained on the offenses charged in the indictment be and the same are hereby provisionally released from custody; and

**IT IS FURTHER ORDERED** that the order releasing defendants be and the same is hereby **STAYED** for 30 days.